No. 20,810.

THE CARGILL COMMISSION COMPANY, *Appellant*, V. E. A. MOWERY, *Appellee*.

SYLLABUS BY THE COURT.

1. CONTRACT—*Purchase of Grain—Contract Completed by Telegrams.* The correspondence between the parties examined and held that the telegrams of June 29, 1915, constituted a contract by which the defendant is bound.

2. SAME—*When Custom and Usage are Admissible.* Ordinarily custom and usage are admissible merely to explain or elucidate something uncertain or ambiguous contained in a contract.

3. SAME—*Demurrer to Evidence Erroneously Sustained.* Plaintiff was entitled to judgment on the pleadings, and the petition being supported by competent evidence, the demurrer to such evidence was erroneously sustained.

4. CONTRACT—*Purchase of Grain—Default of Seller—Remedy of Buyer.* Upon failure of the seller to fulfill a contract covering 30,000 to 35,000 bushels of grain, the buyer may purchase in the open market at the

best prices possible on the seller's account up to the minimum amount, the delivery of which amount by the seller would have been a compliance with his contract.

5. CONTRACT—*By Telegram*—*Mistake in Amount of Grain Sold*—*When Contract is Binding.* When one of the parties to a contract involving a sale of grain by mistake uses a code word indicating a greater amount than he intended, and before the knowledge of such mistake comes to the other party the latter has acted upon the contract, such contract is binding according to the terms actually used by the parties thereto.

Appeal from Reno district court; FRANK F. PRIGG, judge. Opinion filed December 9, 1916. Reversed. Opinion on motion to modify original opinion filed January 18, 1917. Opinion modified.

*J. Graham Campbell,* and *Ray Campbell,* both of Wichita, for the appellant.

*C. M. Williams,* and *D. C. Martindell,* both of Hutchinson, for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff appeals from an order denying its motion for judgment on the pleadings, and from an order sustaining a demurrer to its evidence. It is conceded that telegrams in code passed between the parties in the following order:

"June 29, 1915. Can you offer No. 3 hard wheat, think can pay $1.30, basis Minneapolis, five days shipment. Cargill Comm. Co."

"Offer 30,000 No. 3 hard wheat, $1.32 Minneapolis, five days shipment, bringing $1.30 Kansas City. Answer. Hutchinson Grain Co."

"Bought No. 3 hard wheat early at $1.31 think can work 30,000 same price. Market is lower, answer quick. Cargill Comm. Co."

"Book the 30,000 to 35,000 bushels No. 3 hard wheat $1.31 Minneapolis, wire if booked."

"We book 30,000 to 35,000 No. 3 hard wheat $1.31 basis Minneapolis, five days shipment."

On the same day defendant wrote:

"We herewith confirm sale to you by exchange of wires of 3,000 to 3,500 bus. No. 3 or better wheat (hard) at $1.31 bu., basis del. Minn., Minn., shipments 5 days, weights dest, grades dest. No. 3 to apply at 1c scale. Terms: Sight draft with bill of lading attached unless otherwise stated."

Also the following:

"We enclose confirmation covering sale to you to-day of 3,000 to 3,500 bus. No. 3 or better wheat of Kansas hard. We thank you very much for this trade, will be glad to hear from you again," etc.

On the same day the plaintiff wrote:

"Through exchange of wires to-day, we take pleasure in confirming purchase from you of 30 to 35 M bus. No. 3 hard wheat at $1.31, basis delivered Minneapolis, shipment 5 days, Minneapolis State weights and grades to govern in settement, and usual switching charge. Very glad to have this trade with you, and trust we will have future trades with you, and that your grain will come forward without any delay. Our wheat market closed a trifle higher at .$1.21¾, $1.02⅝ for our September. On this basis good No. 3 hard would be worth $1.30 to 30¼."

Enclosed in this letter was a stereotyped form of confirmation as follows:

"CONTRACT.

"MINNEAPOLIS, MINN., 6/29/1915.

"Hutchinson Grain Company, Hutchinson, Kansas.

"We confirm purchase from you June 29, 1915, by wire of————cars, thirty to thirty-five thousand bushels of 3 hd. or better, Minneapolis inspection and Minneapolis weights to be final @ $1.31 per bushel delivered free on board cars at Mpls. and switched, to be shipped at convenience of the seller, between June 29, 1915, and July 5, 1915, inclusive, from ————by————R. R. via————and to be billed as follows: Mill in transit for Chicago either C. G. W. or R. I. (immaterial provisions). Wire us immediately if any error or omission in this contract. Failure to do so constitutes your acceptance of all the terms hereof.

"Accepted————Seller.

"CARGILL COMMISSION CO.,
"Per A. F. OWEN, *Buyer*."

On July 1 the following telegram was sent:

"Your letter and confirmation of trades 29th received and wrong. We bought as per wires abstain to abstained. (Signed)    Cargill." (Code words for thirty thousand to thirty-five thousand.)

To which the following went in reply:

"Message received our confirmation of 29th covers all wheat sold you on this date. Error in our code word. Thirty hundred to thirty-five hundred all wheat we had to offer. Error apparent as would be impossible to buy thirty thousand old wheat here for five days shipment. (Signed.)   Hutchinson Grain Co."

The following was also sent:

"Not our error. We sold abstain to abstained as message read. Look to you for the wheat or give us orders, we will buy what we can for your account."

On July 1 the defendant wired the plaintiff:

"Don't buy any wheat for our account. Our confirmation covers all wheat sold you."

And the plaintiff wrote defendant:

"We certainly was surprised this A. M. when we received your message which read: 'Your letter and confirmation of trades twenty-ninth received and wrong. We bought as per wires abstain to abstained.' We immediately wired you by day letter, 'Message received. Our confirmation of twenty-ninth covers all wheat sold you on this date. Error in code word, thirty to thirty-five hundred all wheat we had to offer. Error apparent, as would be impossible to buy thirty thousand old wheat here for five days shipment.' Later in the day, we received your confirmation confirming 30,000 to 35,000 bus. of wheat and we are returning same to you, as we did not sell this amount of wheat. This was a clerical error, and we are unable to furnish anything like this much wheat as stated in our day letter. We are very sorry that this has happened, and trust that we may be able to get this matter straightened out satisfactorily."

On July 2, the following letter was sent:

"Cargill Commission Co.,
　　Minneapolis, Minn.

"GENTLEMEN—We are in receipt of your various messages, one last evening and one this morning. We wired you this P. M.: 'Don't buy any wheat for our account; our confirmation covers all wheat sold you.' Now we will ship you from 3000 to 3500 bushels wheat on our contract of the 29th which is all we sold you, as per our letter of yesterday, which explains our stand in this matter. We enclose one invoice covering car of wheat No. 34,393 D. L. W., which is billed to notify you Minneapolis, Minn. Please apply this car on Cont. 822, date 6-29-'15.

　　　　　　　　"Yours truly,　　HUTCHINSON GRAIN CO."

After setting up most of this correspondence the petition alleged a known custom and usage of the grain trade that when a contract is made for the purchase of a minimum to a maximum amount of grain the seller can fill his contract by shipping either at his option, but that upon the seller's failure or refusal to ship the grain covered by his contract and upon notice thereof the purchaser may and must at once buy in the open market and may buy sufficient grain to cover either the minimum or maximum, charging to the seller the difference between the contract price and the price paid, together with costs and charges, and alleging that such purchases were made and claiming damages in the sum of $3020.96. The answer sets up a custom that when grain is bought by telegraph the purchaser immediately writes a confirmation, likewise the

seller, and that it is generally understood and is the custom among grain dealers that no contract is complete without such letters of confirmation, they constituting a part of the contract .and being the contract between the parties; that the defend-ant made a mistake in the amount of grain he intended the plaintiff to book by use of the wrong code word and that the plaintiff knew the defendant could not have procured the quantity of grain covered by the telegram and that the lan-guage used in the telegram was a mistake as to the amount in-tended to be sold.  This custom was denied by the reply and the .alleged knowledge of the impossibility to procure the maximum .amount of wheat was also denied, and it was averred that the defendant shipped the wheat on the contract, after receipt of plaintiff's confirmation and thereby accepted the terms of such confirmation and is bound thereby.  A known custom that the telegrams and not the confirmations governed was .also alleged in the reply.

.  Mr. Owen testified that he was familiar with the general usages and customs of the grain business among grain men .and that it is a general custom when the seller defaults in the contract to allow the purchaser to buy in either the maximum or the minimum as he may see fit; that if the seller refuses to fill his contract the purchaser must buy in immediately the same day or as soon as he can to cover the specified time of sale.  Mr. Beyer testified that he was familiar with the cus-toms of the grain business "and there is a usage and custom to the effect that at the very moment that the buyer finds out that there is a default, that there is a difference between them on the contract and the seller will not ship, he must imme-diately buy in for his account the amount that is short at the market price; must buy in at once upon knowledge of de-fault."  Mr. Shepardson testified that the purpose of sending confimations is simply to confirm a sale previously consum-mated, to check errors if there should be any:

"Where one party makes an offer by telegraph to sell grain at a cer-tain price and another party accepts by telegraph, the contract is com-pleted before the receipt of written confirmation; the wires make the contract; the contract is made at once after the wire is received accept-ing the previous offer made.  If a sale is made by exchange of wires and a confirmation is later sent which differs from the confirmation, the telegrams control absolutely,—the confirmation has nothing to do

with the making of the contract. It is certainly not a trade custom that a sale of grain is not finally closed until a confirmation is sent and received. If a buyer of grain by wire had to wait until he was notified by the seller that he had received a confirmation and that it was all right, all of which might take two or three or more days, he could not do business at all. In our business we have to know, not within a few days, but within a few minutes, whether we have made a purchase or a sale, so that we can at once either buy or sell, as the occasion demands, before the market fluctuates."

In the testimony of Mr. Hinchman on file it was testified that "in almost all instances, after a deal is made by an exchange of telegrams, the parties then mail to each other written confirmations, which are what the words imply, simply words to confirm or verify the previous wires." It is said in the reply brief that this deposition contains a further statement by Mr. Hinchman to the effect that the contract is completed by the exchange of wires, the confirmation having nothing to do with the contract which is complete the minute the wire offer is accepted by wire.

The answer contained no denial except that of any indebtedness to the plaintiff.

If a known and recognized custom of the grain business authorized the purchase up to the maximum so that when the contract was made the parties thereto must be presumed to have so intended, then evidence of such contract should have been received. As already seen, the petition as well as the reply was supported by evidence, and hence the demurrer was erroneously sustained. The plaintiff, however, relies largely on the assignment of error that the court erred in denying its motion for judgment on the pleadings.

Assuming for the moment that the telegrams of June 29 evidenced a complete contract, then upon advice that the defendant refused to recognize it save as to 3000 or 3500 bushels, the plaintiff having already sold 35,000 bushels on receipt of defendant's telegram of acceptance was bound so to act as to mitigate the damages; and if the known custom of the trade also required it, then the plaintiff was doubly justified in buying in the open market at the best price possible what the defendant refused to ship in compliance with the contract.

Regardless of custom and usage, parties may and frequently do contract by telegraph, and such contracts may be as binding

as if in the most solemn form of writing. Some point is sought to be made because the defendant referred to the contract of June 29, as if this amounted to a recognition that the contract was completed on that date, and also because certain minor provisions as to the time and manner of shipment did not appear until in the letters of confirmation, as if that were some evidence that the contract was not yet completed, and also that in the stereotyped form of letter referred to reference was made to correcting any error or omission in the contract, and it is urged that this shows an intention on the part of the plaintiff to deem that the confirmations and not the telegrams constitute the contract. The entire correspondence, however, both by wire and by letter, reveals plainly enough that when the defendant used the word "contract" he meant a contract for 3000 to 3500 bushels; that when the minor provisions as to time and manner of shipment were mentioned in the letters it was with no thought of changing or making a new contract. The stereotyped form of confirmation begins with the statement:

"We confirm purchase from you June 29, 1915, by wire of———cars, thirty to thirty-five thousand bushels."

Then after the provisions as to shipment and billing comes the suggestion to wire any error or omission. This letter form in connection with the other correspondence does not, in our opinion, indicate any intention on the part of the plaintiff to depart from the position that the contract was completed on June 29.

The telegrams themselves consist of a bid for thirty thousand to thirty-five thousand bushels, a direction to book that amount, and a reply that it had been booked. Had the correspondence ended here no question could arise as to its meaning or obligation. When the additional fact appears that pursuant thereto the plaintiff at once sold 35,000 bushels of wheat in reliance upon this contract the final and binding character of the deal is accentuated. When the news of the defendant's position and intention reached the plaintiff the sale of the 35,000 bushels had already been made. Had the contract contained in the messages of June 29 been in the form of a written agreement signed by the parties, and the plaintiff, relying thereon, had acted as it did, the defendant could not then have

been heard to say, at the expense of the plaintiff, that he had made a mistake in the number of bushels he wrote into the contract and therefore was not bound. Had the mistake been discovered and made known to the plaintiff before acting on the contract the error could have been corrected, but it was not the plaintiff's mistake nor was it the plaintiff's fault that the defendant used the wrong word in the contract and did not make this known until the plaintiff had obligated itself to furnish the amount of wheat which the written contract or written evidence of the contract—the telegrams—between the parties called for. It is no answer to say that a known custom of the grain trade makes the letters of confirmation of the telegrams and not the telegrams themselves the contract, for this would be to exalt the manner of transacting business above the legal obligations thereof. In *Strong v. Ringle,* 96 Kan. 573, 152 Pac. 631, the confirmation of the purchase by telephone was received before the grain was shipped. Custom required objection, if any, to be made on its receipt. There was a dispute as to what was said over the telephone. It was held that the letter of confirmation should have governed. While an expression in *Robinson v. United States,* 80 U. S. 363, was quoted (p. 575) to the effect that parties contracting on a special matter concerning which known usages prevail by implication incorporate them into the agreement if nothing is said to the contrary, it was stated, however, that—

"The custom of grain dealers is not invoked here to make a contract between the parties or to contradict any contract they did make. There was a contract, and the question is, What were its terms?

"The general function of usage and custom is definition, explanation, elucidation. Whenever the matter is clear there is no function to be performed." (pp. 575, 576.)

The contract evidenced by these telegrams is free from uncertainty or ambiguity and hence under the rule of *McSherry v. Blanchfield,* 68 Kan. 310, 75 Pac. 121, and *Strong v. Ringle,* supra, there was no room for usage or custom to operate.

We find nothing in the telegrams and letters taken together to destroy the contractual force and effect of the telegrams acted on as they were by the plaintiff. What we do find is a claim of mistake by one of the contracting parties in the choice of a word used by him, knowledge of which claim reached the

other party by a letter written June 29, and by a telegram sent July 1.

The very fact that knowing the usages and exigencies of the grain business the parties made and accepted the offer by wire indicates an intention to act quickly and not a purpose to await the slow course of the mails to determine what, if anything, their telegraphic communications had meant.

"As a written contract is the highest evidence of the terms of an agreement between the parties to it, it is the duty of every contracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract, because the latter, may, and probably will, pay his money and shape his action in reliance upon the agreement, into which he has entered on the ground that he did not attend to its terms, that he did not read the document which he signed, that he supposed it was different in its terms, or that it was a mere form. . . . A mistake of one of the parties only in the expression of his agreement or as to the subject matter, not known to the other, does not affect its binding force, and is no ground for its rescission even in equity, unless it is such a mistake as to show that there is a complete difference in substance between what is supposed to be and what is taken, so as to constitute a failure of consideration. . . . Where a purchaser or seller of any property, real or personal, buys or sells upon a mistaken idea of its nature, quality, or value, this mistake of one, unless induced by the other, does not affect the binding force of the agreement." (9 Cyc. 388, 394, 395.)

It was held in *Griffin v. O'Neil*, 48 Kan. 117, 29 Pac. 143, that an owner of cattle who contracts to sell them for a given price and gives a bill of sale and receives the consideration can not be heard to say that he made a mistake in calculating the price of the cattle. It was said:

"If he made a mistake in his figures, and Mr. Griffin had no knowledge of the mistake, but relied upon the price stated, Mr. O'Neil is responsible and must suffer." (p. 119.)

"If an offer made by one telegram is accepted by another it can not afterward be withdrawn by a third telegram which was forwarded before the second was actually received, but which did not reach its addressee until after the second telegram had come to the hands of the person making and afterward seeking to withdraw the offer. . . . It has been declared that if, in the expression of the intention of one of the parties to an alleged contract, there is error, and that error is unknown to and unsuspected by the other party, that which was so expressed by the one party and agreed to by the other is a valid and binding contract, which the party not in error may enforce. In other words, a party to a contract can not avoid it on the ground that he made a mis-

take where there has been no misrepresentation, and there is no ambiguity in the terms of the contract, and the other contractor has no notice of such mistake, and acts in perfect good faith." (6 R. C. L. 615, 623.)

"A mistake of one party only, not known to the other, is generally no ground for avoiding the contract. The test is to determine whether or not the mistake is as to the substance of the whole consideration, and going to the very root of the matter, and not only to some point, although material, which does not affect the substance of the whole consideration. If the mistake is as to the former, then there is in reality a failure of consideration, which is a defense to the contract. If it is the latter, the contract is valid. Unless there is a mutual mistake, or the presence of undue influence or fraud, there is usually little or no ground for avoiding the contract for mistake." (1 M. A. L. 401.)

It is argued that the acceptance of the 3000 to 3500 bushels after being advised of defendant's intention was an acquiescence therein. On the contrary this acceptance was merely that of a part performance and obviated the necessity of buying in that amount of grain to meet the contract of sale which the plaintiff had made on receipt of the defendant's telegram accepting its offer.

A contract to sell or deliver 30,000 to 35,000 bushels could certainly be fulfilled by the sale or delivery of any number of bushels from 30,000 to 35,000, so that if the defendant had furnished the minimum number of bushels the plaintiff could not have complained. We see nothing ambiguous or uncertain about such a contract so as to admit the alleged custom authorizing the purchaser to buy in on the seller's account the maximum number of bushels, for such a contract clearly means 30,000 or such greater number of bushels up to 35,000 as the seller chooses to furnish. If the purchaser desires to bind the seller to a greater number than the minimum he may so frame the contract—and not having done so he must remain content with the requirements it contains.

Under the pleadings the plaintiff is entitled to recover up to the minimum amount purchased and it was error to refuse judgment thereon.

The order sustaining the demurrer to the evidence of plaintiff is reversed and the cause is remanded with directions to render judgment for the plaintiff in accordance herewith.

OPINION ON MOTION TO MODIFY ORIGINAL OPINION.
Filed January 18, 1917.

The opinion of the court was delivered by

WEST, J.: The defendant in support of his motion to modify the opinion and order herein calls attention to a matter not much noticed by him when the case was briefed and argued and asks that the cause be remanded for trial as to that. In his answer the defendant alleged that it would have been impossible to purchase and ship within five days 30,000 to 35,000 bushels of wheat of the kind required; that the plaintiff knew this and knew that the language used in the telegram was a mistake as to the amount intended to be sold. Although the answer contained no denial of the plaintiff's allegations except a denial of indebtedness, in reply to this allegation as to the ability to purchase the amount of wheat called for by the telegram the plaintiff denied that it knew of such alleged impossibility, denied that it knew the language used was a mistake, and averred that the defendant could have procured such amount of wheat in the time specified.

We have been inclined to assume that in the Hutchinson wheat market in June, 1915, it would have been quite possible to purchase that amount of wheat of the kind in the time specified. But we are now constrained to hold that these allegations formed an issue of fact—the essential one being the plaintiff's knowledge of such alleged impossibility—and that the defendant is entitled to have a jury decide this issue.

The expression in the opinion that judgment on the pleadings should have been rendered and the order so to do are withdrawn, and the cause is remanded for a new trial in respect only to the question of such alleged impossibility and the plaintiff's knowledge thereof, the result of such retrial to be given the proper effect in accordance with the opinion already rendered.

PORTER, J. (dissenting): I am unwilling to concede there was anything to make it appear extraordinary for a grain merchant at Hutchinson in the center of the Kansas wheat belt to be able in 1915 to fill an order for 30,000 bushels of wheat.