No. 23,480.

IRA J. STICE, *Appellant,* v. (WALKER D. HINES, as Director-general and Federal Agent), JAMES C. DAVIS, as Federal Agent, etc., Substituted, *Appellee.*

SYLLABUS BY THE COURT.

FEDERAL EMPLOYERS' LIABILITY ACT—*Injury to Workman—Demurrer to Plaintiff's Evidence Wrongfully Sustained.* In an action founded on the federal employers' liability act to recover for injuries to plaintiff while assisting in replacing upon the tracks a switch engine that had been derailed, *held,* as against a demurrer there was evidence sufficient to take the case to the jury on the issue of whether at the time of the derailment the track was being used in interstate commerce, the question of defendant's negligence, and the issue of assumed risk.

Appeal from Labette district court; ELMER C. CLARK, judge. Opinion filed March 11, 1922. Reversed.

*C. E. Pile,* and *L. E. Goodrich,* both of Parsons, for the appellant.
*W. W. Brown, O. T. Atherton,* and *E. L. Burton,* all of Parsons, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The action was founded upon the federal employers' liability act, and was brought to recover for injuries plaintiff sustained while assisting a wrecking crew in replacing upon the tracks a switch engine which had been derailed in the yards of the defendant at Parsons. The appeal is from a ruling sustaining a demurrer to plaintiff's evidence.

Plaintiff was obliged to show that he was employed in interstate commerce at the time of his injury, which occurred November 5, 1918. The track where the engine was derailed was known as the old K. C. & P. main track. At one time all trains passed over this track. The defendant company became the owners of it in 1889. Its use for passenger service had been abandoned for 31 years. The defendant concedes that part of this track is used as a switch track in the railway yards, but contends that the place where the derail-

ment and the accident occurred had not been for a number of years used for any purpose, and that it had been abandoned. The railway yards and tracks of the defendant in Parsons run northwest and southeast. The general switch tracks and yards for the switching and movement of freight are located in the northwest part of the yards. A blue-print map was introduced in evidence, together with a stipulation of the parties in which the railway company admitted that the portion of the old K. C. & P. line south of the place of the accident was, on and before November 5, 1918, used to switch oil consigned to the city of Parsons from points outside the state, the oil being unloaded at what was known as the city oil platform. It was admitted that several industrial plants, referred to in the evidence as the Harvester Company's buildings, the Sprague warehouse, the marble works, the Britton coal office and bins, and the Parsons Poultry and Egg Plant, were all located on the track in question; but the defendant contended that the deliveries of shipments to these industries and warehouses, which were all north of Broadway, were made by entering the track at the north switch from that portion of the yard where freight trains came in and were broken up; also that the delivery of shipments of oil to the city of Parsons south of the place of the accident was made by entrance upon the track in question at the south switch; the defendant contending that none of these shipments passed over the portion of the track between Corning avenue, the place of the accident and the north side of Broadway.

In support of the demurrer the defendant quotes from the testimony of E. D. Wray, who was operating the switch engine at the time it was derailed. On cross-examination he testified that the last time he saw a passenger train on the old K. C. & P. main track was about '84; "I don't know exactly the last time I saw a freight train passing over the point where derailment took place. This track has not been used to run trains over for a few years." He testified that ordinarily they switched cars to the poultry and egg plant, the Britton coal yards, the marble works and the Sprague warehouse from the north end; that in switching oil shipments to the oil station of the city the usual and ordinary route was to come to this track from the south end; the engine that was derailed is a standard engine, one of five or six in the yards at Parsons. The engines were in a pool, and each was worked as it came the turn for that engine. "After engine No. 34 derailed, we left it and got another engine."

The same witness, however, had testified in direct examination that they used the portion of the track in question if they had occasion to place cars there; and "we used that track to place them from both yards. If we could get in from the north end easier than we could get in from the south end, we would come in from the north end, and if we could come in from the south end easier we would come in from the south end. We handle the cars the closest and easiest way. During these years we have used the entire track. . . . The Harvester Company has a loading platform on the old P. & P. main; they can unload from both tracks. The unloading platform has been there ever since the Harvester Company has been built . . . 8 or 10 years."

J. G. Ehman, a switch-engine foreman of defendant for twenty-two years, testified that the switch track is known as the west track of the Parsons yards. "I know how the old P. & P. main was used by the company on November 5, 1918, and for some years before. That track was used for the industrial points . . . by the International Harvesting Company, Swalm Lumber Company, the old Bell Telephone Company." He had used the track to set out cars for the Blue Valley Creamery, the poultry and egg company, the Sprague warehouse and other industrial plants; and he said it was also used to unload oil for the city and to unload telephone poles. "On and before November 5, 1918, we used all the track in our switching operations." It is true that on cross-examination he said that cars were not set out to the Sprague warehouse from the south "very often." His testimony is, however, that at the time of the derailment they were going to the Sprague warehouse to "spot" a car.

The plaintiff sought to bring his case within the doctrine of *Southern Railway Co. v. Puckett*, 244 U. S. 571. In that case a workman was injured in jacking up a wrecked car to rescue a fellow employee, and the trial court held his act, nevertheless, was the first step in clearing the obstruction to the tracks to the end that the remaining cars for train No. 75 might be hauled over them. The supreme court concurred in this view, and in the opinion said:

"We concur in this view. From the facts found, it is plain that the object of clearing the tracks entered inseparably into the purpose of jacking up the car, and gave to the operation the character of interstate commerce. The case is controlled by *Pedersen v. Delaware, Lackawanna & Western R. R. Co.*, 229 U. S. 146, 152; *New York Central & Hudson River R. R. Co. v. Carr*, 238 U. S. 260, 263; *Pennsylvania Co. v. Donat*, 239 U. S. 50; *Louisville & Nashville R.*

*R. Co. v. Parker,* 242 U. S. 13. *Pedersen v. Delaware, Lackawanna & Western R. R. Co.,* supra, holds that a workman employed in maintaining interstate tracks in proper condition while they are in use is employed in interstate commerce; the other cases are to the effect that preparatory movements in aid of interstate transportation are a part of such commerce within the meaning of the act." (p. 573.)

In the briefs of the defendant it is urged that there was no showing at all that on the day in question this particular portion of the track was used for the purpose of forwarding interstate commerce. In order to identify the portion of the track which plaintiff claims had in some manner been withdrawn from interstate traffic it appears on the plat attached to the stipulation, marked in yellow, the other portions of the track being in red. But it was all one track and apparently the employees of the defendant supposed that the portion marked on the map in yellow could be used the same as any other, for it appears that when the engine went off the track it was being used to take a car to an industry located north of Broadway. As against a demurrer, there was some evidence that the track was being used at the time of the derailment in interstate commerce, and to indicate that plaintiff at the time of his injury was assisting in restoring an instrumentality to interstate commerce. While plaintiff's evidence upon this point was weak, we think the case should have been submitted to the jury for their determination of that question. On a demurrer to the evidence every reasonable inference must be indulged in favor of the party who introduced the evidence. (*Christie v. Barnes,* 33 Kan. 317, 6 Pac. 599; *City of Syracuse v. Reed,* 46 Kan. 520, 26 Pac. 1040; *Rogers v. Hodgson,* 46 Kan. 276, 26 Pac. 732; *Buoy v. Milling Co.,* 68 Kan. 436, 75 Pac. 466; *Hoffmeier v. Kansas City-Leavenworth Rld. Co.,* 68 Kan. 831, 75 Pac. 1117; *The State, ex rel., v. Gerhards,* 99 Kan. 462, 464, 162 Pac. 1149; *Bushey v. Coffman,* 103 Kan. 209, 214, 173 Pac. 341.)

One of the grounds of the demurrer is that there was no evidence of negligence on the part of the defendant. The plaintiff's evidence tended to show that he was working under the immediate personal direction of a foreman who selected the plan of doing the work and that the plan was this: Cribbing had been laid under the front and rear ends of the engine upon which a jack was placed. The jack had a lifting capacity of fifty tons. At the time of the accident to plaintiff, it was lifting about one-half of its capacity. The boiler was five and one-half feet in diameter. The head of the jack was three

and one-half inches square. An oak wedge eighteen inches long, four inches square at one end and feathered to an edge at the other, was rested against the side of the boiler. Against this hardwood block, the head of the jack was placed. When the forward jack was first set, two men operated it with the lever. More than two men were required to lift the engine and the foreman gave an order for the workmen to double up, and the plaintiff and the other workmen came from the rear to the forward jack; all four, while standing on the cribbing, operated the jack by pulling down on the lever. The evidence showed that the jack was placed in a slanting position in order to raise the engine upward and at the same time push it toward the track, and as the lever was operated the bearing of the load was changed more or less. As the jack was extended upward the load would tend to roll to one side and it became necessary to change the position of the jack or it would be thrown out of position automatically. Someone had to decide when to change the jack to a more upright position. While the four men were standing on the cribbing and pulling down on the lever, the jack was thrown out of position, fell against the plaintiff and broke his leg. If the defendant failed to exercise reasonable diligence and care to give to the plaintiff a reasonably safe place in which to perform this dangerous work it was negligent. As against a demurrer, we think the evidence was sufficient to go to the jury on the question of the defendant's negligence.

Another ground of the demurrer was that the plaintiff had assumed the risk. It is said the evidence shows that plaintiff had been employed in the car department for about three years in heavy repair work on cars, had become familiar with the use of jacks of the character used on this occasion; that he helped to carry the blocks for the foundation of the jacks; had helped to place them in position; had helped to lift the jack upon them and to adjust the head of it against the boiler; that just prior to the accident he had operated a similar jack at the south end of the boiler, and that he selected his position at the forward jack without any suggestion that anything was dangerous. The plaintiff testified that he did not remember of helping to set up the north jack; he thought it weighed about 200 pounds; it was of a kind not used on the repair track very much; he was the last man to take hold of the handle of the jack; he stood partly on the blocking and partly on the ground; his recollection was that they operated the jack once and "it slipped out

when we all went to pull down"; he had worked on the car-repair track about two and one-half years and his duties consisted of repairing cars; before that he had been a farmer all his life. Our conclusion is that it was for the jury to say on all the facts whether he knew and appreciated the danger of the jack slipping and causing the injury.

It follows that the judgment is reversed with directions to overrule the demurrer to the evidence.