Fielding v. Williamson.

---

No. 25,493.

ARTHUR P. FIELDING et al., *Appellants,* v. M. V. WILLIAMSON et al., *Appellees.*

SYLLABUS BY THE COURT.

SALES—*Excess Payment—Evidence—Weight and Sufficiency.* The evidence adduced in support of plaintiff's cause of action to recover an excess of advance payments on certain deliveries of "September corn" over the prevailing market price of such corn (less a differential agreed to in writing) considered, and held sufficient as against defendants' demurrer thereto.

Appeal from Riley district court; FRED R. SMITH, judge. Opinion filed March 7, 1925. Reversed.

*R. P. Evans,* and *George Clammer,* both of Manhattan, for the appellants.
*Hal E. Harlan,* and *A. M. Johnston,* both of Manhattan, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: Plaintiffs, who were a firm of grain dealers at Manhattan, and its legal successors, brought this action against defendants for a sum of money alleged to be due as the result of certain transactions which had been undertaken between the parties pursuant to a certain written contract and a subsequent oral modification thereof. The contract reads:

"AGREEMENT.

"February 12, 1921.

"We agree to buy of Frank Enoch, M. V. Williamson and Lewis Williamson, 20,000 bushels No. 3 or better corn. Price to be determined will be 22½ cents per bushel below the average price of Kansas City September corn, 1921, the day the sellers want to take the market. The market may be taken on any day the sellers want to sell or any future day, but cannot accept market on any previous date. We agree to pay 40 cents per bushel advance on this corn when it is delivered at our elevator at Manhattan. The corn to be delivered in the next 60 days.

"This agreement is accepted.          "E. H. FIELDING, *Buyers.*
     "Signed: M. V. WILLIAMSON, *Seller.*
     "Signed: B. F. ENOCHS, *Seller.*"

Plaintiffs alleged the execution of this contract and that it was afterwards orally modified so that defendants might deliver to plaintiffs 25,000 or 30,000 bushels of corn, in lieu of the 20,000 bushels originally stipulated; and that pursuant to the contract thus modified defendants did deliver to plaintiffs 26,987¼¼ bushels, on which plaintiffs did advance to defendants the sum of 40 cents per bushel, aggregating $10,994.63. Plaintiffs further alleged that by the custom of the grain trade where a vendor failed to choose a current date or future date in the month of September on which he would accept the prevailing market price for September corn the market price for the last day of the month should govern. Plaintiffs also alleged that such custom and usage of the grain trade was well known to defendants and was by implication intended to be incorporated into the contract. Plaintiffs further alleged that defendants never did select a September date on which they would take the market price for their corn, and that the market price at Kansas City was 39¼ cents per bushel on September 30, which after the stipulated deduction of 22½ cents per bushel, left the net price due defendants at 16¾ cents per bushel, and that defendants owed to plaintiffs the difference between 16¾ cents per bushel and the 40 cents per bushel which they had advanced to defendants, which excess advancement was 23¼ cents per bushel, and aggregated $6,291.19, for which sum plaintiffs prayed judgment.

Defendants answered with certain admissions and denials, and alleged that the contract set up by plaintiffs was not a complete instrument but merely a partial memorandum of the agreement of the parties. They alleged that it was part of the agreement that defendants should receive 40 cents per bushel for the corn as a minimum price and that if corn advanced in price the plaintiff partnership was obligated to pay defendants whatever excess the Kansas City market would warrant—

"But said obligation to pay such excess only became binding upon said copartnership in the event these defendants exercised their option on some present or future day when the price so to be determined by deducting 22½ cents per bushel from the average price of Kansas City September corn, 1921, on the day so selected, actually exceeded forty cents (40¢) per bushel. That in the event the defendants failed or neglected to exercise the option granted to them in said instrument exhibit A, then the said copartnership, Geo. T. Fielding's Sons, should not be obligated to pay anything in excess of the forty cents (40¢) per bushel paid to said defendants at the time of delivery of said corn.

"These answering defendants specifically deny that they ever agreed

either orally or by virtue of said memorandum, exhibit A, to return any portion of the forty cents (40¢) per bushel paid to these defendants by said copartnership for the corn so delivered."

Defendant Lewis Williamson filed a separate answer, denying that he had agreed to the written contract, and denied that he ever ratified it or became bound by it.

On behalf of plaintiffs, evidence was introduced tending to support the material allegations of their petition. The execution of the contract as set out above was not put in issue. It was shown that 26,987 bushels of corn had been received by plaintiffs from defendants, and that they were paid therefor, as follows:

M. V. Williamson ................................... $5,343.43
Frank Enoch ....................................... 2,500.00
Lewis Williamson .................................. 2,964.00

It was shown that after this corn was delivered and the above-named payments made, there was a conversation between Arthur Fielding and M. V. Williamson on July 6, 1921, in which the latter stated that when the price of corn got back where he would not lose any money he wanted to get out of the deal; and Fielding told him that the plaintiffs' partnership would comply with his instructions, but that the market at the time was way below his limit, but if the price of corn reached his limit, they would be glad to close the deal. A witness testified:

"He [Williamson] said we want every damned bushel of it protected. After this on the same day we were talking about this corn going down all the time, and Mr. Williamson said: 'Arthur, when this corn goes to a point where I won't have to put up anything, I want out.' I spoke up and says, 'This corn might go on down instead of up.' He says, 'You keep your damned mouth shut. You are a pessimist."

Evidence was adduced to show that September corn was a familiar term in the grain business, and meant corn for delivery to be settled for any time in the month of September, the seller having the option of choosing any current or future day of that month, but not a past day, in which he might elect to accept the prevailing market price, and that if he failed to select any such date, then by a well-known and established custom of grain dealers, the prevailing market price on the last day of the month was the price which governed the rights of vendor and vendee. One witness of thirty years' experience as a buyer and seller of grain testified:

"The term 'September corn' has a recognized and universal meaning. If I delivered grain to be settled for in September, I have an option at any time

during the month of September to go to the man who buys my corn and settle for it. If for any reason I fail during the month to make delivery, then the last day of the month will be considered the day on which he takes it."

It was also shown that about the time defendants delivered the corn to plaintiffs, the cash price at Manhattan was 44 cents per bushel. Other items of evidence were certain correspondence from plaintiffs addressed to M. V. Williamson with a postscript addressed to Lewis Williamson, asking confirmation of oral orders given the same day by M. V. Williamson, narrated above, was introduced. A check for $600 to Lewis Williamson, with notation on its face "Adv. Corn Contract," showed indorsement by the payee, and that the check had been paid.

The foregoing contains but briefly the salient features of the evidence for plaintiffs.

Defendants' demurrers thereto were sustained; jury discharged; judgment entered for defendants; plaintiffs appeal.

Plaintiffs' argument is a résumé of the evidence narrated above, and it inveighs against the trial court's ruling on the demurrer. As this court is unable to discern offhand just what was lacking in the evidence to establish plaintiffs' *prima facie* cause of action, we have carefully considered the argument in behalf of defendants which seeks to justify the judgment. Defendants first direct attention in a counter abstract to some testimony of Arthur Fielding to the effect that nothing was said to defendants about paying back any part of the 40 cents per bushel advanced by plaintiffs. There was also some testimony that before corn could be designated as September corn it had to be delivered during the month of September. But the written contract did specify that the corn was to be delivered in 60 days from February 12, and the contract characterized the corn thus delivered as September corn. (*Commission Co. v. Mowrey,* 99 Kan. 389, 396, 161 Pac. 634, 162 Pac. 313.) However that may be, any conflict in testimony as to what was meant by September corn is unimportant now, when we are merely considering the propriety of a demurrer to plaintiffs' evidence where only the most favorable interpretation and significance of the testimony in behalf of the party adducing it can be attributed to it. (*The State, ex rel., v. Gerhards,* 99 Kan. 462, 162 Pac. 1149; *Mentze v. Rice,* 102 Kan. 855, 172 Pac. 516; *Stice v. Railway Co.,* 110 Kan. 763, 766, 205 Pac. 616.)

Defendants argue that the transactions under consideration were merely options. It is perhaps possible that the dealings of the par-

ties were susceptible of such an interpretation; if so, that was a jury question. It is also argued that because the written contract was typed upon appellants' letterheads the language is theirs and is to be most strongly construed against them. Such is the general rule, but we discern no equivocal language in the contract to which it could be applied.

Appellees argue that appellants are precluded from asking the court to adopt a construction by which the instrument would mean something different from what it says. We do not understand that to be appellant's contention. The written contract could be modified by a subsequent oral agreement. That it was so modified is scarcely denied. Indeed, the fact that defendants delivered some 27,000 bushels of corn on a memorandum contract calling for 20,000 bushels is unimpeachable evidence of a modification of the contract, expressly or by implication. Being only a memorandum contract, as virtually all contracts for the buying and selling of grain in considerable quantities are (*Strong v. Ringle,* 96 Kan. 573, 152 Pac. 631), parole evidence was admissible to clarify its abbreviations and obscurities, but not, of course, to contradict its written terms. (*Grain Co. v. Coöperative Association,* 109 Kan. 293, 198 Pac. 964; *Stanley v. Buser,* 105 Kan. 510, 514, 185 Pac. 39.) And, indeed, the defense pleaded to plaintiffs' cause of action apparently relies on that principle of the law of evidence, although at this time we are not concerned with that phase of the controversy.

Counsel for defendants are especially insistent that as to Lewis Williamson, at least, the demurrer to the evidence was proper. While Lewis did not sign the contract, nevertheless pursuant to that contract he did deliver part of the corn contracted for, and received payment by check on which there was the notation, "Advanced corn contract," and a copy of the letter of July 6 confirming oral instructions of W. V. Williamson was mailed to him with a special postscript directing the same to his attention; and he acquiesced therein, or at least did not correct, countermand or otherwise repudiate the arrangement. From these and other matters in evidence the case as to him was a matter for a jury to determine as well as against the other defendants. In *Strong v. Ringle,* supra, it was said:

"The custom of grain dealers is not invoked here to make a contract between the parties or to contradict any contract they did make. There was a contract, and the question is, What were its terms? The parties now dispute about some of them. In order to avoid the consequences of misunderstandings, defects of memory, in some instances hypertrophy of memory, and in other

instances equivocation or downright untruthfulness, those engaged in the grain business have adopted a method of rendering the result of their oral negotiations definite and certain. After oral negotiations have been concluded, one of the parties immediately states the result in writing and submits the writing to the other for approval. It is the duty of the recipient of the writing to communicate his objections to the other party, if he have any, and to decline performance if unwilling to be bound by it. Formal approval need not be communicated, and performance without objection constitutes assent to the correctness of the written statement of the contract. The same custom obtains in other branches of commerce and forms a self-imposed statute of frauds of the most salutary character." (p. 575. See, also, *Strong v. Thurston*, 107 Kan. 368, 191 Pac. 575.)

The other arguments urged in support of the judgment have not been ignored, but after full consideration this court is persuaded that the plaintiffs' evidence established a *prima facie* case in support of the cause of action alleged by them. It follows that the trial court's ruling on the demurrer to plaintiffs' evidence must be set aside and the cause remanded for further proceedings consistent herewith.

It is so ordered.

Johnston, C. J., not sitting.