No. 26,828.

ELMER BEELER, *Appellant*, v. THE CONTINENTAL CASUALTY
COMPANY, *Appellee*.

### SYLLABUS BY THE COURT.

ACCIDENT INSURANCE—*Notice of Injury*—*Whether as "Soon as Reasonably Possible" Jury Question*. In an insurance policy which indemnified the holder against accidental injuries, and required the holder to give notice to the insurance company within twenty days after the date of any accident causing an injury to the insured, but where the policy also provided that—

"Failure to give notice within the time provided in this policy shall not invalidate any claim if it shall be shown not to have been reasonably possible to give such notice and that notice was given as soon as was reasonably possible,"

it is held, under the evidence and peculiar circumstances narrated in the opinion the question whether plaintiff gave notice of his accident and injury as soon as was reasonably possible was one of fact for the determination of a jury and not subject to disposition as a matter of law.

Appeal from Montgomery district court; JOSEPH W. HOLDREN, judge. Opinion filed October 9, 1926. Reversed.

*Chester Stevens*, of Independence, for the appellant.

*W. N. Banks, O. L. O'Brien* and *Walter L. McVey*, all of Independence, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action to recover on a policy of accident insurance. Defendant's demurrer was sustained, and plaintiff appeals.

The facts were these: Plaintiff held a policy of insurance issued by defendant, which among other matters bound defendant to indemnify him for loss of time through accidental injuries. It provided:

"The Continental Casualty Company, . . . in consideration of the agreements and statements contained in the application herefor and the payment of an annual premium of $25 as therein provided, does on this 18th day of January, A. D. 1922, hereby insure Mr. Elmer Beeler (hereinafter called the insured) in class select of the company, as a president and general manager, oil supply house, office duties, in the principal sum of three thousand dollars with weekly indemnity of thirty-five dollars."

The policy set out in detail a schedule of payments for specific

Accident Insurance, 1 C. J. p. 511 n. 51; 7 A. L. R. 175; 29 A. L. R. 500; 14 R. C. L. 1329.

Beeler v. Continental Casualty Co.

injuries, and also set out its obligation for immediate total disability, and intermediate disability, of no present concern, and then provided:

"C. *Partial Disability*. Or if injury such as before described shall not at once wholly and continuously disable the insured, but shall thereafter within one hundred days wholly disable him, . . . the company will pay one-half said weekly indemnity for the period of such disability not exceeding two hundred weeks. . . .

"STANDARD PROVISIONS.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"4. *Written notice of injury on which claim may be based must be given to the company within twenty days after the date of the accident causing such injury*. In event of accidental death, immediate notice thereof must be given to the company.

"5. . . . *Failure to give notice within the time provided in this policy shall not invalidate any claim if it shall be shown not to have been reasonably possible to give such notice and that notice was given as soon as was reasonably possible*."

The plaintiff was a large, strong, healthy man, forty-four years of age, actively engaged in buying and selling pipe, machinery and tools used in the business of developing oil and gas wells. On the forenoon of May 8, 1922, while out in the yard showing some casing pipe to a prospective customer, he was standing on some pipe and his feet slipped from under him and he fell heavily on his back. He got up without assistance, and although he felt some pain he went on with his business. As the day wore on he felt little pain, but some stiffness. Some three or four days later he felt a tearing sensation across his stomach, especially when he was eating. When driving his automobile over rough ground he would feel some pain in the small of his back. He continued to attend to business, but the pains in his stomach and abdomen grew more severe, and within a few days after his fall he called on a local physician, Doctor DeMott, who pronounced his ailment to be biliousness and gave him medicine adapted to relieve that malady. This treatment did no good, so he returned to Doctor DeMott, who still thought his trouble was biliousness and gave him more medicine. Getting worse instead of better, on May 29, 1922, plaintiff went to Claremore, Okla., to take medicinal baths and to consult a Doctor Bushyhead, who thought plaintiff had malaria and prescribed for him accordingly. Plaintiff took Doctor Bushyhead's medicine, and that doctor came to see him several times during the ensuing three weeks, but plaintiff continued to grow worse, and then Doctor Bushyhead told him there was some-

thing wrong with him which he could not discover, and advised plaintiff to go to an expert diagnostician, and recommended Doctor Sloan, of Kansas City. Accordingly, early in July, plaintiff went to Kansas City and was subjected to a searching examination by Doctor Sloan. That doctor also took plaintiff to a Doctor Lee and said he could find nothing wrong with plaintiff, but thought "the trouble might be in the front door," which plaintiff understood to mean his mouth. Doctor Lee examined plaintiff and sent him to an X-ray operator to get a photograph of his teeth. Doctor Lee then stated that he could find nothing wrong with plaintiff except bad tonsils, which he removed. Plaintiff remained in a hospital for a week and then stayed at the hotel in Kansas City for some time under observation by Doctor Sloan. Plaintiff then returned to his home in Independence and went to bed pursuant to Doctor Sloan's orders. Doctor Taggart, a local physician, then took up plaintiff's case, under directions of Doctor Sloan, who kept in touch with the case himself by frequent conversations with Doctor Taggart over the long-distance telephone. But the efforts of all these doctors were unavailing, and plaintiff was confined to his bed for several months, never free from the pains in his stomach, and gradually losing control of his limbs. At one time or another plaintiff had apprised all these physicians of his severe fall in May, 1922, but none of them attached any significance to the fall as a cause of his peculiar affliction. Plaintiff testified:

"I told Doctor Sloan about these pains, the drawing sensation across my stomach; that it felt like I had swallowed a brick. I also told him I had had a fall, and described the way I fell by slipping off of these joints of pipe and striking the small of my back on the pipe. He said he could not attribute my sickness to the fall, in view of the fact that he thought it would have put me down and out at the time if it had been severe enough to cause my sickness. After I had described these conditions to him and he had said that he did not think it was the result of the fall, I concluded that the fall did not have anything to do with my sickness, and never at any time from the date of the fall to the time I went to Doctor Sloan did I think that the fall had anything to do with it. . . .

" . . . Doctor Sloan had told me that I had myelitis. He also told me that my tonsils were poisoning my system. Doctor Sloan gave me iodine. I followed the advice of Doctor Sloan and Doctor Taggart for about six months and abandoned their treatment because I was not getting well, and I thought they were wrong in their diagnoses."

Eventually Doctors Sloan and Taggart decided that there was nothing in their healing art which would do the plaintiff any good,

and after he had been confined to his house and mostly to his bed
for nearly a year, Doctor Taggart suggested that a competent
osteopath be called. A practitioner of that art, Dr. Blandin Smith,
then took charge of plaintiff's case and made the discovery that
several of plaintiff's vertebræ were out of line. An X-ray picture
of plaintiff's backbone was taken which disclosed a subluxation be-
tween the dorsal and lumbar vertebræ. Doctor Smith began to
treat plaintiff and continued to do so for five or six months, and
plaintiff made considerable improvement. When these treatments
began plaintiff could not walk without assistance, and his feet shuf-
fled. In June, 1923, plaintiff heard of a certain chiropractor in
Guthrie, Okla., Dr. Willis T. Neely, who made a practice of setting
bones that were out of place. Plaintiff testified:

"I was not dissatisfied with the way Doctor Smith had treated me, but I
felt that I had not gotten along as fast as I should, and Doctor Smith told
me that there was a bone in my back that he could not get back in its proper
position on account of the fact that I was too heavy and he was not a large
man. I thought I was probably too heavy for him to fix me up. At Guthrie
Doctor Neely examined me and I told him about the fall that I had had and
about the symptoms and how I felt, just like I had told the other doctors, and
he told me that he thought my illness was the result of the fall. I was not
convinced because I wanted to get well before I would say who was right. I
remained at Guthrie from about the latter part of June until about the 1st
of September, taking treatments from Doctor Neely. He gave me two treat-
ments every day and some days three treatments. I got better; the pain in
my stomach and the heavy feeling left me. Under Doctor Neely's treatment
my ability to walk improved and my control over my legs became better.
When I came back from Guthrie about the first of September, 1923, all of my
stomach trouble was gone, but I had not recovered the full use of my legs,
and could not walk as well as I could before the fall. After I came back home
I continued to improve; however, it was three or four months after my re-
turn from Guthrie about the first of September, before I felt that I was fully
recovered. I never became convinced nor believed that the diagnoses of
Doctor Smith and Doctor Neely were correct and that the diagnoses of the
other doctors were wrong until I was practically recovered, and at about the
time that I wrote the letter to the defendant. At the time I wrote this letter
I had then become convinced that my sickness was the result of the fall, and
as soon as I had become convinced I wrote the letter to the insurance company.

"The fact that Doctor DeMott, Doctor Bushyhead, Doctor Sloan and Doc-
tor Taggart all diagnosed my case as not the result of this fall induced me to
believe, and I did believe, that the fall had nothing to do with my illness, and
when Doctor Smith of this city came to the conclusion that the suffering I
was enduring was, in his opinion, the result of the fall, I did not in fact regard
the same seriously, in view of the diagnoses by the preceding four doctors to
the contrary. I was not satisfied until Dr. W. T. Neely, of Guthrie, made the
examination and definitely pronounced it the result of a fall, and, coupled

with my rapid recovery under his diagnosis and treatment, I am convinced that the illness I suffered from resulted solely and directly from this fall. . . .

"*Cross-examination:*

"When I returned from Guthrie I was able to walk around and attend to my business a short time each day. After Doctor Smith examined me and started to treat me I had no further treatments from Doctor Taggart or any of the former doctors whom I had consulted. Doctor Smith told me I had two or three vertebræ knocked out of place. . . . I thought there was a chance that I might get better because the other doctors had told me that they were mistaken about it. To a certain extent I believed what Doctor Smith said about the cause of my illness. I abandoned the treatment of the former doctors because they told me they did not know what was the matter with me. Doctor Smith treated me from about December 1, 1922, to June, 1923, and gave me two or three treatments a week. I consulted no one else during that period.

"When Doctor Smith first started to treat me I was not able to be up; I could not sit up; I was in bed all of the time. Under Doctor Smith's treatment I got better and got so I could walk uptown.

"At the time I got in touch with Doctor Neely I cannot say that I then believed that the fall was the cause of my sickness. I had tried the other doctors to a point where they said I was getting worse and they did not know what was the matter with me. While Doctor Neely was recommended to me as being a good man to adjust bones in the back, I cannot say that I then believed that the dislocation of these bones from the fall was the cause of my trouble. I could not say that I even believed it a little bit."

On October 18, 1923, plaintiff wrote a letter to the defendant giving it a comprehensive narrative of the facts as outlined above, which was the first and only notice the company received of plaintiff's accident and injury.

On the point that plaintiff had failed to notify the company within twenty days as provided in the clause of the policy quoted above, defendant denied liability; and apparently its demurrer to plaintiff's evidence was sustained for the same reason.

Was this ruling correct? Did the facts outlined above, considered most favorably in plaintiff's behalf, clearly show that there was nothing for a jury to consider, and that it was the duty of the trial court as a matter of law to rule that plaintiff had waited altogether too long before he notified the defendant of his accident and injury—that plaintiff did not give the company such notice "as soon as was reasonably possible"? Under the evidence in this case, just when could it be said dogmatically that the time limit for giving notice to the company expired? There should be no trouble in fixing such a point of time if the failure to notify "as soon as was reasonably possible" was so obvious and beyond cavil that a jury's

duty to determine that question was properly dispensed with. Under the circumstances, plaintiff could not be expected to notify the company until he realized the fact that his ailment was occasioned by his fall. One after another of his medical advisers belittled his suggestion that the fall might have had something to do with his malady. It was therefore quite reasonable that plaintiff should adopt their views and dismiss from his own mind the idea that his fall might have occasioned it. Moreover, the fact that his disease appeared to be a sort of tearing across his stomach, and eventually led to a want of control of his feet, would hardly suggest to a nonprofessional person like plaintiff that the root and origin of such indisposition was a fall that caused only a slight pain in his back. Nor can it be arbitrarily said as a matter of law that when Dr. Blandin Smith ventured the opinion that his trouble originated in his back he was forthwith put on notice himself so as to make it his duty to notify the company without further delay. We cannot say it was his bounden duty then and there to reject the opinions and advice he had already gotten from the four or five doctors who had treated him theretofore, nor that his failure to notify the company at that time relieved the defendant of liability. It was quite natural that plaintiff should not immediately attach implicit credence to what Doctor Smith said nor to what Doctor Neely said, nor until under the ministrations of these professional men he had so far recovered that the correctness of their diagnoses was fairly demonstrated by the results which their skill achieved.

So far as disclosed by the record this court fails to discern in this case any substantial difference in principle from that which controlled the case of *Hawthorne v. Protective Association,* 112 Kan. 356, 210 Pac. 1086, and cases cited in note thereto in 29 A. L. R. 500. Giving that favorable consideration to plaintiff's evidence to which it was entitled as against a demurrer thereto (*Stice v. Railway Co.,* 110 Kan. 763, 766, 205 Pac. 616; *Rowan v. Rosenthal,* 113 Kan. 604, 215 Pac. 1008), this court is constrained to hold that it was a fair question of fact for the jury to consider and determine, and not for the trial court to rule upon as a matter of law, whether plaintiff did or did not notify the company of his accident and injury as soon as it was reasonably possible under the peculiar circumstances of this case.

The judgment of the district court is reversed and the cause is remanded for a new trial.