No. 21,507.

ALLEN H. BUSHEY, *Appellant*, v. GEORGE M. COFFMAN, *Appellee*.

SYLLABUS BY THE COURT.

1. PURCHASE OF BANK STOCK—*False Representations—Evidence Sufficient as against Demurrer*. The evidence adduced by plaintiff to support his cause of action for damages sustained through defendant's false and fraudulent representations touching the financial condition of a bank, whereby the plaintiff was induced to purchase defendant's stock—a controlling interest—in the bank, examined, and held sufficient against a demurrer.

2. PROMISSORY NOTE — *Obtained by Duress — Evidence Sufficient as against Demurrer*. The pleadings and plaintiff's evidence to support a cause of action for rescission of a contract made under duress for the purchase of land and for the return and cancellation of plaintiff's note given therefor examined, and held sufficient against a demurrer to plaintiff's evidence; and held, also, that the issue of duress and consequent illegality of the note raised by the pleadings and established *prima facie* by plaintiff's evidence made it improper to render judgment for defendant on his cross petition, although plaintiff's answer to the cross petition was not verified.

3. FINANCIAL RESPONSIBILITY—*Opinion Evidence Competent*. The opinions of well-informed bankers and business men touching the financial reliability of persons of their community and the promptness and ability of such persons to pay their debts may be of some evidentiary assistance to a jury in determining the worth or worthlessness of such persons' notes as assets of a bank.

4. SALE OF BANK STOCK—*False Representations—Evidence*. Plaintiff's evidence tended to prove the following facts: The defendant organized a bank, controlled its stock, and conducted its business for several years. He represented to plaintiff that the bank was prosper-

14—Kan.—3099

ous; that the book value of its stock was $125 per share or better; that the bank was successfully maintaining a salary list of $5,000 per annum; that its profits for the current year would allow 10 percent for dividends, and would allow the charging off of $1,000 per annum for bad notes and leave $2,000 per annum to carry to undivided profits; that he did not believe there was $500 worth of bad paper in the bank's assets of $140,000 to $150,000 in loan notes. He sold his controlling interest in the bank to plaintiff after enjoining plaintiff not to make an independent local investigation of the status of the bank and its business, and both orally and in writing defendant told plaintiff: "You will have to take my word for it." In reliance on these representations plaintiff paid $23,700 for defendant's stock. The representations were altogether false—some $45,000 of the bank's notes were worthless and were mostly mere renewals of uncollectible loans. The state bank commissioner ordered these loans charged off as worthless and gave the stockholders but a few hours in which to collect from among themselves an assessment of $140 per share to avert the closing of the bank, and the plaintiff's investment was a total loss. These and minor related incidents considered, and held to be competently probative of a cause of action for damages against defendant.

Appeal from Labette district court; ELMER C. CLARK, judge. Opinion filed June 8, 1918. Reversed.

*John Madden,* and *C. E. Cooper,* both of Wichita, and *Fred A. Sabin,* of La Junta, Colo., for the appellant.

*W. D. Atkinson,* of Parsons, *W. R. Cline,* of Erie, *T. R. Evans,* and *H. P. Farrelly,* both of Chanute, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This appeal chiefly concerns the sufficiency of the plaintiff's evidence to establish his two causes of action against defendant—the first count being for damages sustained by plaintiff in the purchase of worthless bank stock in reliance on false and fraudulent representations of the defendant, and the second being for rescission of a contract for the purchase of land by plaintiff under duress. In the second, also, plaintiff asked for the return and cancellation of a note for $2,500 given to defendant in payment for the land purchased. To the second cause of action the defendant filed a cross petition, in which he prayed judgment for the amount of the note.

A demurrer to plaintiff's evidence in support of his first cause of action was sustained; and judgment on the plead-

Bushey v. Coffman.

ings and on plaintiff's evidence was rendered for defendant on the second cause of action.

The errors assigned relate to these rulings.

Touching the first cause of action, the evidence for plaintiff tended to prove the following facts:

In July, 1913, the plaintiff, who had been chiefly engaged in school work for thirty years, sought to change his vocation and engage in the banking business. To that end, he called on a Denver broker, A. J. Smith, who informed him that a controlling interest in the People's Home Bank of Rocky Ford, Colo., was for sale by its owner, the defendant, George M. Coffman, who was the founder, president, director, and principal managing officer of that bank. Plaintiff went to Rocky Ford and interviewed Coffman, and the latter discussed the bank's condition, its earnings, and the price of the bank stock, and Coffman gave his failing health and that of his wife as his reason for selling. Bushey, the plaintiff, returned to Kansas, and shortly afterwards he opened a correspondence with Coffman with a view of purchasing Coffman's bank stock. On August 5, 1913, the defendant Coffman wrote to Bushey:

"Yours at hand, and I want to say that I think you are needlessly alarmed about my notes, I never saw a bank that had $140,000.00 or $150,000.00 worth of notes, that some of them were not at least doubtful. I don't believe we have over $500.00 worth, but that are good, and if handled properly can be collected and yet it might be more than that amount would prove bad, but that is all in the game. Our gross earnings this year will be $15,000.00 or more, that means that after all expenses are paid together with 10% dividend, we will have over three thousand dollars to take care of bad paper or to carry to undivided profits. I figure that we can pay all expenses which includes $5,000.00 a year salary, 10% dividends, carry $1,000.00 a year to surplus, and then have $2,000.00 left, either to take care of bad paper or to carry to undivided profits. That is the kind of a business I have. The book value is better than $125.00. I could sell all my stock to local parties inside of six months in small lots at $130.00. If I should sell to you at $150.00 and pay Smith of Denver $5.00 a share that would leave me about $2,000.00 profit for building up this business, and then you want me to guarantee all notes. I could not think of it for a minute. If you should come here as you suggest, some one would start the rumor that I was trying to sell and then if you should decide not to buy, they would say that there was something wrong with the bank. No, Mr. Bushey, you have every chance to find out whether I am a man of my word, and when I tell you we have a good business, that we have a good class of notes, you will have to take my word for it, or not. Since you was here, we collected

$810.00 charged off paper, and carried that to undivided profits. We have two or three hundred that are more than six months past due, that we are charging off. Some of them we hope to have paid before the end of the year. ,If you want a good business in a good town, you could afford to charge off $1,000.00 a year bad paper, and then have a splendid business. Of course I don't think there is any danger of any such ·loss, but if there was you would be away ahead of the game."

Other excerpts of letters from Coffman to Bushey read:

"Aug. 16th, 1913.

"Yours of the 14th inst. at hand, and in reply would say you would have to take one hundred fifty-eight shares (158) . . . Of course if I remained as President I could not give possession of house while I remained as President, as that would give away the deal. The boys and I would stay with you until you had a chance to get acquainted, and the run of the business. Of course while we remained, we would expect same salary we are drawing now. . . . I would have no objection to have Mr. Smith of Denver meet you here on the Sunday you come, if Mr. Smith is careful not to let these other bankers get on to the reason of him being here. You see we are crowding the other banks very close on the business, and they are very jealous, and would seize on anything to stop our growth. In fact, if you or Mr. Smith let this out, I will deny the whole thing and it will be all off. . . . I enclose statements of the three banks. You will notice we have $10,000.00 more deposits than the First; and only $20,000.00 behind the Rocky Ford National, so we can't afford to take any chances. Things are looking so good that I am sorry I ever made this offer, and I will be very thankful if you decide not to take it, but my word is passed, and I always make good."

"Aug. 23rd, 1913. . . .

"You are certainly a suspicious man. I am willing to be perfectly fair with you, and if you come here again, and really desire a good business, I am satisfied you will find that I will treat you fairly and will advise you honestly, what I think the best way to handle the business, so as not to lose any of the business that I have worked so hard to get. Of course you can put this off as long as you see fit, but I will not consider myself under obligation to hold the business for you. Other parties want it, but frankly, I am not at all anxious to sell. I think I am making a mistake in selling at price I have made you."

"8-27, 1913. . . .

"Yours just received and will say a bank is like a woman, the least breath of suspicion sometimes ruins the reputation, so be careful that you don't mention the name of our bank when you consult with your friends. I tried to impress this on your mind when you were here."

The evidence for plaintiff tended to show that on the faith of these written representations of Coffman, and further oral representations to the same general effect made by him prior to the writing of these letters and afterwards, Bushey pur-

chased from Coffman 158 shares of stock in the bank for the sum of $23,700, at the rate of $150 per share, par value being $100 per share; that Bushey paid cash for 151 shares, and Coffman retained the remaining 7 shares temporarily, it being part of the deal that Coffman should remain as president and director and that Coffman's two sons should remain as employees of the bank until Bushey had familiarized himself with the bank's busness and with the local situation. , One of the inducements of Bushey's purchase was the promise of Coffman to teach Bushey and Bushey's son "all about the banking business. . . . I will see that you make good . . . and we'll stay with you,as long as it is necessary."

The sale of the stock was made to Bushey early in September, 1913, and thereupon he was elected vice-president and commenced work in the bank. In January, 1914, Coffman retired as president and Bushey assumed its management. Ere then, however, and while he was serving as vice-president he learned that Coffman's pretensions as to the bank's condition were partly untrue, but not until after Coffman had retired did he fully learn how grossly the bank's condition had been misrepresented to him. Bushey served as president from January, 1914, until January, 1915, and during that time he discovered that many loans of the bank were merely repeated renewals of older loans, sometimes with and sometimes without the earned interest added to such renewals, and that the makers of these notes would not or could not pay, that many of the makers were of poor financial rating or unworthy of credit, and some were insolvent. In September, 1914, Bushey sold his interest in the bank at a nominally high figure, but in such sale he was required to guarantee his proportionate share of the bank loans based upon the ratio of his stock ownership to that of the bank's entire capital; and some time later, in January, 1915, the bank commissioner of Colorado required these worthless loans, aggregating about $45,000, to be charged off from the bank's resources, which completely extinguished the bank's total capital of $30,000, and created an additional shortage; and the stockholders were given but a few hours to assess and collect from among themselves $140 per share as a condition of permission to keep the bank open and to avert or postpone its dissolution for insolvency.

Plaintiff's evidence is somewhat obscure as to whether he realized anything whatsoever by the sale of his stock in September, 1914, his counsel's interpretation of his evidence on that point being that he received nothing, while counsel for defendant say that Bushey realized something out of the nominally high figure specified in his contract for the sale of it. However that may be, the evidence for Bushey, read in the favorable and auspicious light with which such evidence must always be viewed when tested by demurrer (*The State, ex rel., v. Gerhards,* 99 Kan. 462, 464, 162 Pac. 1149), tended to show that he was completely and thoroughly swindled by the defendant; that defendant grossly, inexcusably, and falsely represented to Bushey that the bank was in a flourishing condition, that its business was prosperous and desirable, when the facts were sadly to the contrary—with all of which Coffman was thoroughly familiar—; that Bushey relied upon Coffman's statements in purchasing the bank stock; that one of the conditions imposed by Coffman surrounding the transaction of purchase and sale was that Bushey was not to make an independent and effective inquiry among those who might know or be expected to know the true condition of the bank and its business, but that he should rely upon Coffman's word of honor. (12 R. C. L. 375.) "You will have to take my word for it," wrote Coffman; and again he wrote, "If you or Mr. Smith, let this out, I will deny the whole thing and it will be all off." (*Greisa v. Thomas,* 99 Kan. 335, syl. ¶ 5, and pp. 340, 341, 161 Pac. 670.)

It does not seem necessary to set out the facts as developed by the evidence at greater length. The falsity of Coffman's representations inducing the sale and Bushey's reliance thereon were shown; Coffman's familiarity with the bank's condition was shown; the utter worthlessness of the bank stock was shown; the total loss of the consideration paid for the stock was shown; and the consequent damage to Bushey was established. (12 R. C. L. 433.) No waiver was pleaded, and it may be doubted if any estoppel was developed in the cross-examination of plaintiff's witnesses. Certainly there was none under the scrutiny of a mere demurrer to the evidence. This is not saying that a jury would necessarily arrive at the conclusion that Bushey had committed no acts of estoppel. A court, how-

ever, has no such privilege in ruling on a demurrer to the evidence. We do not overlook the fact that Coffman did not guarantee the bank's notes, that he declined to insure their payment. That does not release him in the slightest degree from the obligation which the law imposes upon him in favor of the person who purchased his bank stock in reliance upon the truthfulness of his representations concerning it. If Coffman consummated the deal on the theory that the law would excuse his fraudulent representations because of his literal declination to guarantee the bank's notes—and his correspondence is susceptible of that interpretation—his artifice and duplicity are the more reprehensible and his deliberate purpose to deceive and to defraud Bushey becomes only the more clear. (*Hindman v. First Nat. Bank,* 50 C. C. A. 623, 112 Fed. 931; *Boles v. Merrill,* 173 Mass. 491; *Handy v. Waldron,* 18 R. I. 567; 1 Benjamin on Sales, 555 *et seq.;* 20 Cyc. 13, 14; 2 Mechem on Sales, § 36. See, also, article on Fraud and Deceit in 12 R. C. L. 248, 294, 303, 310, 319, 323, 324, 380, 409.)

Neither did Bushey waive or condone the fraud practiced upon him, by paying for the seven remaining bank shares of Coffman. He was then altogether too deeply enmeshed in the matter to rescind and repudiate. His contract with Coffman was then partly executed, and that rendered it impracticable for him to rescind. His only practical redress was to pursue the course already undertaken by him, and to look to Coffman later for damages when their extent could be accurately ascertained. (*Van Natta v. Snyder,* 98 Kan. 102, 157 Pac. 432; *Geiger v. Cardwell,* 99 Kan. 559, 163 Pac. 613; *McKenna v. Morgan,* 102 Kan. 478, 480, 170 Pac. 998.) The case of *Mathews v. Hogueland,* 98 Kan. 342, 157 Pac. 1179, cited by appellee, related to a sale of bank stock without either knowledge or intent to defraud and is altogether inapplicable to the present case.

Touching the second cause of action, there could be no judgment for defendant on the pleadings, for the plaintiff's petition had raised an issue of illegality—duress—and defendant's answer traversed the pertinent facts relating thereto. The addition of the matter pleaded by defendant as a cross petition did not require a denial by defendant under oath, since the want of such verification confessed nothing but what plaintiff's pleadings had already conceded—the execution and delivery of

the note—and the illegality involved in the question of duress remained in issue. (*Hill v. Republic County*, 99 Kan. 49, 51, 160 Pac. 987.) As to the evidence of duress, it was fairly established, if a jury cared to believe it—and on demurrer the trial court was bound to treat it as true—that associated with the bank-stock bargain and negotiated about the same time, the parties agreed to exchange some Colorado land of defendant for some Missouri land of plaintiff; but in December, 1913, about the time plaintiff began to learn of the bank's infirmities, Coffman threatened to leave the bank and take his sons with him, unless plaintiff would purchase the Colorado land outright, ignoring the prior bargain of the parties for the exchange of the lands. Coffman said:

"Now, Mr. Bushey, you have had your way about this land deal, now I will have mine. . . . I will make you a price of $2,500 and I will take your note for two years but you will return that $150 to my credit and take this land and make me out a note or me and my boys walk out of here and never be back in your bank and your bank is bust."

Bushey testified:

"I says, why, Mr. Coffman, you and your boys agreed to stay here as long as I wanted. He says, 'that was on the condition that everything was agreeable,' and I was scared and I turned around and walked out of the bank. I was excited."

While the cross-examination of Bushey slightly tended to develop his later acquiescence in this enforced bargain by his payments of the semiannual interest on the note, etc., yet from the precarious situation of the larger related transaction—the swindling of Bushey in the bank-stock deal, the impending insolvency of the bank, the threats of Coffman and his power to precipitate the collapse of the bank—there was ample evidence, if believed by a jury, to prove that the coercion of Bushey and the duress imposed upon him by Coffman continued throughout the period covered by the interest payments on the note given for the Colorado land. It would amplify this opinion far beyond all reasonable limits to cover other minor incidents developed by the cross-examination of plaintiff's witnesses. The court has perused the voluminous abstracts with laborious care, and neither therein nor in the able brief of defendant's counsel can we discern the propriety of taking the second cause of action from the jury. The most that can be said for the argument presented by defendant's

counsel is that it will be good debatable matter for a jury's consideration.

Other matters urged by plaintiff require little discussion. One of these we note. The opinion evidence of Rocky Ford bankers and other local business men touching the financial standing of the makers of the notes, the worthlessness of which exhausted the bank capital and rendered valueless the stock sold to Bushey, was excluded. This evidence was competent. Bankers who have long been engaged in their line of business ought to know, and usually do know, the financial standing of the average citizen of their community who may seek or need credit at a local bank; they know or ought to know his ability to meet his obligations and his disposition to do so. They become experts in their line, just as lawyers and doctors and other especially skilled persons do in theirs. (3 Wigmore on Evidence, §§ 1917-1923.) The competency of the testimony of the Rocky Ford bankers and business men could readily have been determined by applying the ordinary work-a-day rule: Can the jury get any appreciable help from these witnesses touching the financial standing, trustworthiness and responsibility of the makers of these notes? (3 Wigmore on Evidence, § 1923; and see, also, *Railway Co. v. Utilities Commission,* ante, p. 111, 172 Pac. 1022.) Since evidence touching a person's reputation for truth, sobriety, industry, and his reputed standing for citizenship and morality is ordinarily competent and admissible, such evidence ought logically to be admissible to show his reliability and promptness in paying his debts and his ability to do so. (Abbott's Proof of Facts, 3d ed., 336.) Such testimony may be greatly discounted by cross-examination, but that would only depreciate its evidentiary value and would not affect its competency.

The judgment is reversed and the cause remanded for a new trial.