### No. 29,414.

### The Fourth National Bank in Wichita, *Appellant*, v. O. H. Webb et al., *Appellees*.

(290 Pac. 1.)

Opinion filed July 5, 1930.

*H. C. Osborne, Charles G. Yankey, John L. Gleason* and *Kenneth K. Cox*, all of Wichita, for the appellant.

*C. L. Foster,* of Sedgwick, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This action was brought by the Fourth National Bank in Wichita against O. H. Webb and Harry Webb to recover upon a promissory note for $5,000 executed by them. Defendants resisted payment on the ground of misrepresentations and fraud in the transactions under which the indebtedness was incurred. The trial resulted in a judgment for defendants, and plaintiff appeals.

It is insisted that the court erred in overruling the motion for a new trial and that the evidence in the case wholly failed to establish a defense to the note. The note was a renewal of several notes signed by the defendants on what was alleged to be false and fraudulent representations as to the value of certain stock in the Derby Oil Company sold to the defendants. The note, which is a non-negotiable instrument, is a renewal and extension of several notes of like form and character given by the defendants to H. M. Payne & Co., agents of the bank, of which Dan F. Callahan was president, who was also treasurer of the Derby Oil Company. Payne, who represented Callahan and the oil company, sold 18,000 shares at $1.25 a share to defendants, the aggregate purchase price being $22,500. Callahan and his agents, they allege, had large experience in dealing in Derby oil stock and had authentic knowledge as to the selling price and value of it, and falsely represented to these defendants that it was worth and was selling at $1.25 a share, when it was known to them to be selling for and worth only sixty cents a share.

In behalf of defendants it was alleged that they were farmers, had never dealt in or owned oil-company stock, had no experience whatever, but knew Callahan and his bank and relied on their representations. The defendants were told that Callahan and his agents were their friends and desired to help defendants to make a profit, that the stock was worth at that time $1.25 a share, and they were thereby induced to make the purchase. Thereafter defendants, without knowledge of the falsity of the representations made by Callahan and his agents, paid several large sums of money on the notes from time to time to the bank, amounting in the aggregate to $17,500; that the value of the stock at the time of the purchase by defendants was only $10,800, and that they have already paid $6,700

in excess of its value, exclusive of the note of $5,000 upon which this action is brought. There is an averment that the bank through its officers and directors had full knowledge that the original notes had been procured by fraud, and that these facts were peculiarly within the knowledge of the bank and its president, Callahan, and that the defendants did not know of the fraud, nor learn, until about the time the action was brought, what the relations were between the bank and Payne. The agents who made the sale of the stock brought a letter to them signed by Callahan, recommending the stock, and they further represented to defendants that the stock would pay a dividend of twelve per cent.

The testimony shows clearly enough that Payne was the agent of Callahan and the bank, and the notes obtained for the stock were turned over at once to Callahan and Derby. The agent carried with him and presented to defendants a letter of Callahan recommending the purchase of the stock sold. Defendants knew and had confidence in Callahan, and, being ignorant as to such property and its value, naturally relied on the statements of Callahan and of the agents he sent out to represent him. There was testimony showing that the statements made were false and must have been known to be false by those making the same. True, some contradictory evidence was offered in behalf of plaintiff, a part of which was the testimony of an auditor who estimated the value at $1.25 per share, but evidently he was giving the book value of the stock. As we have seen, there was evidence by the president of the company that stock was sold at eighty and eighty-five cents a share. The conflict in the evidence in that respect, however, has been settled by the jury, and its verdict, supported by competent evidence, determines that the false representations were made and that defendants purchased the stock in reliance upon them.

It is argued that the representations should be regarded as mere expressions of opinion—dealer's talk—as to value of property that was fluctuating in character and actually changed from day to day. The expressions were not in the form of a speculation as to value or a mere expression of opinion, but was a positive declaration of present value upon which dividends of twelve per cent were paid. The parties were not on equal terms. Defendants were unsophisticated farmers who had no knowledge of that class of property, while those making the representations were men of experience, engaged

in the business of selling stock, and were evidently what is known as high-powered salesmen. The agents who made the statements were frankly told by defendants that they had never dealt in stock of any kind and that they would have to depend upon Callahan and his agent as to the value of the oil stock. They had confidence in the president of the bank whose letter had been read to them, and it appeared that these simple-minded defendants bought the stock in reliance on the representations made to them.

A case involving a similar question is *Griesa v. Thomas*, 99 Kan. 335, 161 Pac. 670, where false representations were made in the sale of catalpa seedlings, by one familiar with their value, to purchasers who had no knowledge of or experience in the growth of catalpa trees. The purchasers relied on the representations made to them by the seller as to the price of the property, which was not readily ascertainable. It was held that in the circumstances the agent was bound to tell the purchaser the truth within his peculiar knowledge if he told him anything about it. Some of the views expressed there are appropriate here. It was said:

"While the rule is that statements of value or market price of familiar commercial commodities, like grain, wool and the like, are ordinarily mere matters of opinion (*Graffenstein v. Epstein & Co.*, 23 Kan. 443; *Burns v. Mahannah*, 39 Kan. 87, 17 Pac. 319; 12 R. C. L. 281), yet the rule is otherwise where the value or market price is difficult of ascertainment, and where the vendor is familiar with such value and the vendee is not. Where an unfamiliar kind of property is involved and the market value is not easily ascertained, representations as to its market value are usually considered statements of fact and not of opinion. And where a vendor knowingly and grossly misrepresents the true market value of such a commodity, and the purchaser is entirely ignorant of it and is induced to buy in reliance upon the vendor's false statements as to its market value, the vendee may have a cause of action or a defense based thereon. (Citing cases.) . . . . The rule that positive statements of value are mere 'puffing,' or the lying talk in which dealers may indulge with impunity in their transactions with ignorant persons, is one which is subject to criticism and is not universally followed. At all events, courts should steadily set their faces against the extension of its application. In a plain case of cheating, swindling or gross duplicity the rule of *caveat emptor* should have no application. (*Nairn v. Ewalt*, 51 Kan. 355, 32 Pac. 1110.)" (pp. 340, 341.)

See, also, *Bushey v. Coffman*, 103 Kan. 209, 173 Pac. 341; *Bank v. Wright*, 108 Kan. 355, 195 Pac. 881.

The rule of the cited cases is fairly applicable to the instant one and the evidence appears to be sufficient to sustain the general finding of the jury.

A number of payments were made by the defendants upon the notes given for the stock purchased, and plaintiff contends that defendants are therefore estopped from setting up the defense of fraud. It was alleged and shown that defendants did not learn of the fraud until about the time the action was brought. Payments made prior to the discovery of the fraud do not operate as a waiver of the fraud nor preclude a defense to the note upon that ground. (*McKenna v. Morgan,* 102 Kan. 478, 170 Pac. 998; *Bank v. Wright,* supra.)

We find no error in the record, and it follows that the judgment must be affirmed. It is so ordered.