No. 47,255

DONALD J. WOLF and ANNA WOLF, *Appellees,* v. F. C. BRUNGARDT and CHARLES D. TAYLOR, *Appellants;* and FARMERS NATIONAL BANK OF VICTORIA, KANSAS, *Defendants.*

(524 P. 2d 726)

Opinion filed July 17, 1974.

*Lelyn J. Braun,* of Garden City, argued the cause, and was on the brief for the appellants.

*Ed Carpenter*, of Topeka, argued the cause, and *Lee Turner*, of Turner, Chartered, of Great Bend, and *Raymond L. Dahlberg*, of the same firm, were on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action to recover damages for fraud and breach of contract. It arises from a rather complex set of pleadings. The Farmers National Bank of Victoria, Kansas, commenced an action against Donald J. Wolf and Anna Wolf to collect on notes payable to the bank and on a guaranty agreement. The Wolfs counterclaimed against Farmers National Bank alleging fraud and breach of contract. The Wolfs also joined F. C. (Frank) Brungardt as a third-party defendant upon similar allegations of fraud and breach of contract. The present action was thereafter commenced by Donald J. Wolf and Anna Wolf against F. C. Brungardt, Charles D. Taylor and the Farmers National Bank. The petition alleged fraud and breach of contract arising from the same facts set forth in the counterclaim and third-party claim alleged in the previous action filed by the bank. The issues were consolidated for trial in the latter case presently here on appeal. The trial resulted in a jury verdict and judgment for the plaintiffs and against F. C. Brungardt and Charles Taylor in the amount of $25,000. The verdict absolved the Farmers National Bank from any liability.

This court was informed on oral argument the cross-appeal filed by the Wolfs against the bank had been settled and the cross-appeal is no longer an issue in the case.

The basic questions in the case are: (1) Whether the statute of limitations is a bar to the action for fraud and breach of oral contract; and (2) whether the evidence presented at the trial was sufficient to submit the case to the jury on any theory.

The record in this case, consisting of 387 pages, is literally a transcript. The following is a brief summary of the evidence.

Charles Taylor owned and operated the Hays Electronic Supply Company, a dealership of wholesale electronic parts. Early in 1968 Taylor and the business were in financial difficulty, *being indebted some $25,000 in excess of their assets,* including a large amount to the Farmers National Bank. With the advice and counsel of F. C. Brungardt, the president of the bank, Taylor decided to seek a partner willing to supply additional capital deemed necessary to get the business back on its feet.

About this time Taylor met Donald Wolf, then nineteen years

old, who expressed an interest in coming into the business. Donald Wolf, a high school graduate without any business experience whatever, met Taylor while Wolf was working in a Pizza Hut. The two discussed the proposition and Taylor showed Wolf a paper disclosing there was approximately $5,000 in accounts payable. There was no other indication of any indebtedness, though Wolf did not specifically ask about other indebtedness. Taylor said he would require $15,000 for Donald Wolf to buy into the business.

Taylor testified the business was actually in "bad financial condition" at the time of the discussion with Donald Wolf, and, in fact, had been for several years. The business had done its banking at the Farmers National Bank of Victoria, Kansas, since 1964, and in May of 1968 it was indebted at the bank to the extent of $33,039.03. However, Taylor felt the business could become a going concern, if he could obtain twenty-five, twenty-six or twenty-seven thousand dollars.

Donald Wolf did not have the money to make such an investment, but his mother, Anna Wolf, was willing to help him obtain a loan. They talked with two lending institutions but were unsuccessful. After these rejections Donald Wolf talked with Taylor again. Taylor suggested that Donald and Anna Wolf talk with F. C. Brungardt, who was president of the Farmers National Bank of Victoria (hereafter referred to as the bank).

F. C. Brungardt had handled the banking needs for the business for several years and was familiar with its problems and the extent of its indebtedness at the bank.

On May 24, 1968, the Wolfs met with F. C. Brungardt at the bank and discussed the possibilities of borrowing the money. F. C. Brungardt assured them the bank would loan them the money. Anna Wolf filled out a financial statement on this occasion. According to Anna, F. C. Brungardt told them the business was a "good deal" for Donald; Donald would make it "real good"; that F. C. Brungardt was going to invest $12,500 as a silent partner; and that F. C. Brungardt assured Anna she would not lose her house, which she was going to mortgage. Donald and Anna Wolf testified they believed F. C. Brungardt should know what a good business would be particularly if he were investing in it himself. F. C. Brungardt denied making any of these statements at this meeting.

The following day, on May 25, 1968, a meeting was held in the office of Robert Glassman, who was the attorney for the bank and

represented F. C. Brungardt personally in some matters. F. C. Brungardt arranged the meeting. Those present in addition to F. C. Brungardt and Mr. Glassman were Donald Wolf, Anna Wolf, Richard Wolf (Donald's brother), and Charles Taylor. The purpose of the meeting in Anna's words was, "To make an agreement and discuss about this business that I was mortgaging my home to get into." During the meeting F. C. Brungardt kept notes. These notes were later given to Mr. Glassman to prepare a written agreement. At the meeting an oral agreement was reached which provided that Charles Taylor would have a 45% interest in return for his present investment, Donald Wolf would invest $15,000 "Cash as of date" for a 30% interest and F. C. Brungardt would invest $12,000 as a silent partner "Cash Nov. 1, 1968" for a 25% interest. The notes made by F. C. Brungardt in his own handwriting disclosed the agreement provided life insurance was to be procured for each of the three partners, and the salaries for Charles Taylor and Donald Wolf were set at $600 and $440 per month respectively.

During this meeting in the attorney's office both Charles Taylor and F. C. Brungardt reasserted to the Wolfs that this was a "good deal" for Donald and he was going to make a lot of money. No disclosure of the financial condition of the business or the indebtedness to the bank was made. No financial statement was presented or prepared.

F. C. Brungardt testified his proposed investment was expressly conditioned upon the Kansas State Corporation Commissioner's releasing from escrow 51,000 shares of stock which he owned in a Kansas corporation; that he had no other funds available with which to make the investment; and that the stock was not released by the commissioner from escrow until 1970.

Robert Glassman, F. C. Brungardt's attorney, drew up a document embodying the terms agreed upon at the meeting, and notified F. C. Brungardt of its completion sometime after June 6, 1968. Brungardt did not pick up the written agreement until after the Wolfs instituted this action, in July 1971. Neither Taylor nor Donald Wolf ever inquired about the written contract and apparently they were not aware of any intention to memorialize the agreement between the parties in writing at that time.

Subsequent to the meeting at Glassman's office and before the end of May 1968, Anna Wolf borrowed $17,000 from the bank. She executed a note for the loan and later, on September 13, 1968,

mortgaged her home to secure the loan. She loaned Donald Wolf $15,000 in return for his note. Donald then wrote a check to Hays Electronic Supply for $15,000. This investment by Donald Wolf was placed in the business account. Charles Taylor immediately paid on the indebtedness at the bank reducing the total indebtedness at the bank to $24,500. This fact, the amount of the payment, was recorded only in the checkbook retained at the place of business. Additionally, Taylor assumed $4,500 of the indebtedness personally at the bank and these two transactions reduced the business indebtedness to $20,000. The reduction of the Hays Electronic's debt to the bank was for a brief period only. On June 12, 1968, $4,200 was borrowed from the bank for the business account.

Donald Wolf testified he was not aware Charles Taylor had made the payment of $8,539.03 to the bank for debts on May 27, 1968. However, sometime in 1968 he did discover that Taylor had drawn a check in that amount, and when he approached Taylor about it he received an equivocal answer.

F. C. Brungardt never came up with his share of the investment in the business. Charles Taylor testified he finally gave up on F. C. Brungardt coming through in September or October of 1968. As late as November 1968, Donald Wolf was told the money was in escrow, intimating it would still be forthcoming.

Donald Wolf assumed his duties in the business of Hays Electronic Supply about June 1, 1968. He was paid a salary of $440 per month and his duties were largely that of an employee, meeting people who came into the store and making sales. Donald would tend the store Monday through Friday, and during this time Charles Taylor would travel in the nearby area and sell their merchandise. Charles Taylor was the acting manager of the business. He handled the payroll, the checkbook, ordering of inventory, and what financial records were kept. Charles Taylor also paid some personal obligations out of business funds and did not tell Donald Wolf. All of the business' records, the checkbook and returned checks were kept in an unlocked desk located in the store.

Occasionally, Donald Wolf opened the bank statements, and would thus become aware of the balance in the checking account. He had an idea of the amount being carried in the business account. By the fall of 1969, F. C. Brungardt still had not invested any money into the business and both Donald Wolf and Charles Taylor would visit F. C. Brungardt from time to time about obtaining his money. According to Taylor, F. C. Brungardt's money "would have

helped tremendously." In November of 1968, Donald Wolf and Taylor visited F. C. Brungardt, who was no longer associated with the bank as its president, once again concerning his portion of the money to be contributed to the business. During the winter of 1968-1969 it became more and more apparent the business was failing. The business had very little inventory and it lacked funds to purchase any. Donald Wolf testified he was still unaware of the businesses' large amount of indebtedness at the bank. The business continued to worsen in financial condition until May 1969, when Charles Taylor, according to his testimony, abandoned the business. Payments had ceased to be made to the bank.

In May 1969, Donald Wolf went to the bank to again borrow money. He and Charles Taylor, according to Donald's testimony, believed if they could borrow $11,000 to $12,000 to purchase inventory the business would pick up. Donald Wolf was able to borrow $11,400, but Farmers National Bank insisted that Anna Wolf transfer the original loan of $17,000 to another institution. When this was accomplished Donald Wolf was loaned the money upon a guaranty executed by Anna Wolf. The guarantee and a security interest in the business assets, equipment and inventory secured the transaction. The Wolfs transferred the original loan to the Golden Belt Savings and Loan, located in Ellis, Kansas. It was necessary for Anna Wolf to mortgage her home with Golden Belt Savings and Loan on the loan transfer.

Ed Brungardt, the brother of F. C. Brungardt, had become the president of the Farmers National Bank at Victoria, Kansas, at this time. In arranging for this second loan Donald Wolf told Ed Brungardt he thought he had been taken by F. C. Brungardt and Charles Taylor in the original transaction. Ed Brungardt testified the original loan made by the bank to the Wolfs was past due, delinquent and that he wanted it out of the bank "because he [Donald Wolf] said there was something misleading about it."

On the same day that Donald Wolf borrowed $11,400 from the bank, May 8, 1969, Taylor made arrangement with the bank to assume $25,000 of the business' indebtedness personally. Taylor's assumption of the indebtedness was secured by his mother-in-law's guaranty at the bank. Donald Wolf testified he was unaware of Taylor's transaction with the bank at that time. There was a conflict in the testimony as to whether Donald Wolf was present at the bank when Charles Taylor transacted this business at the bank.

Charles Taylor testified that thereafter he considered Donald

Wolf the owner of the "whole ball of wax," and that he and Donald Wolf had an agreement whereby he would assume the indebtedness, Donald would own the business in its entirety, and Taylor would work for him as a salesman. Nonetheless, Charles Taylor further testified there was "no change in [his] duties or salary after May 8, 1969," and there was never a formal transfer of ownership of any kind.

The $11,400 which Donald Wolf borrowed from the bank was spent on accounts payable and inventory mainly through the supervision of Charles Taylor. Donald Wolf obtained another loan from the bank on June 14, 1969, apparently to purchase additional inventory.

Donald Wolf and Charles Taylor's business routine continued as usual until mid-July 1969, when Taylor began taking some classes in Kansas City for additional training in electronics. He attended the classes during the week, but returned to Hays, Kansas, on weekends and would stop by the store to discuss the business with Donald Wolf and advise him as to which bills to pay. This arrangement continued through July and August 1969, but Charles Taylor ceased to do the bookkeeping and Donald Wolf did not know how to do it.

Sometime in August 1969, Charles Taylor informed Donald Wolf that he would not return to the business after he completed the classes he was attending in Kansas City. Finding himself stranded, Donald Wolf did not know what to do with the business. Donald Wolf did not believe he could operate the business alone because he did not know enough about it. He was forced to lockup the store during the week and travel in the area to sell merchandise. Finally, in September 1969, Donald Wolf decided to close the business. This was after he had borrowed another $800 from the bank to purchase inventory. During this time his previous notes were coming due and he had no alternative but to renew them.

Upon closing the business Donald Wolf went to the Farmers National Bank of Victoria and inquired about the indebtedness of the business to the bank. Only then did he discover, according to his testimony, the large amount of indebtedness which had burdened the business. Prior to this time neither Charles Taylor nor F. C. Brungardt had disclosed this fact to him, but had, in fact, represented the business to be in good shape.

At the time of the closing of the business Donald Wolf was obligated to the bank on three notes for the total amount of $12,453.71

and to Anna Wolf for the sum of $15,000 on a note he had executed for the original loan. Anna Wolf was obligated to the Golden Belt Savings and Loan on the $17,000 loan secured by a mortgage on her home.

Eventually, Golden Belt foreclosed the mortgage on Anna Wolf's home. Farmers National Bank obtained judgments against Donald Wolf on the three notes he had executed, and against Anna Wolf on the basis of her guaranty of those notes.

The jury, after hearing the evidence and considering the court's instructions awarded the Wolfs a total of $25,000 against F. C. Brungardt and Charles Taylor, consisting of $12,500 actual damage for fraud suffered by the plaintiffs and $12,500 actual damages for breach of contract suffered by the plaintiffs. The jury denied the Wolfs' claim against the Farmers National Bank and it also denied punitive damages.

F. C. Brungardt and Charles Taylor have duly perfected an appeal from the jury's verdict and judgment of the court.

The appellants contend the causes of action for fraud and breach of contract were barred by the statute of limitations as a matter of law, or, in the alternative, these issues should have been submitted to the jury as questions of fact. The trial court refused to submit these issues to the jury by denying the appellants' requested instructions and by its refusal to submit special questions pertaining to the statute of limitations. The trial court also refused to direct a verdict for the appellants on the ground of fraud, because it ruled the evidence did not show as a matter of law the plaintiffs' claim was barred by the statute of limitations.

Under the provisions of K. S. A. 60-512 a cause of action for breach of contract not in writing must be instituted within three years. It is axiomatic that the three year period commences to run from the date of the breach of the contract. In the instant case the appellants contend the lawsuit against F. C. Brungardt and Charles Taylor was not filed until more than three years after the contract was made, which was May 25, 1968. This, of course, is not the proper standard. The crucial inquiry is whether or not the Wolfs' cause of action for breach of contract was instituted within three years of the date of the breach of the oral agreement. The Wolfs' petition against the appellants was filed July 6, 1971. All of the evidence presented at the time of the trial showed that F. C. Brungardt reneged on his agreement to invest $12,000 in the business in the fall of 1968 (his own handwritten notes indicate

he was to invest his share on November 1, 1968), well within the three year period required by 60-512, *supra.*

The appellants in their brief do not claim that there was any evidence to show a breach of the oral contract more than three years prior to July 6, 1971.

Charles Taylor testified he first became aware that F. C. Brungardt was not going to comply with his part of the agreement in the fall of 1968. Taylor, who was managing the business and taking care of the records and books, did not perform his part of the agreement by the purchase of insurance called for in the agreement. The purpose of the insurance was to effect a buy and sell agreement by the parties to the agreement should one of them die, thereby permitting the wife or designated beneficiary to whom the insurance was payable to purchase the entire stock of the deceased party to the agreement. Under the oral agreement Charles Taylor received a 45% share in the business for his investment in the business on May 25, 1968. To Donald Wolf this meant assets disclosed to him as inventory and investment over and above $5,000 in accounts payable by the business. But with an indebtedness of over $33,000 by the business to the bank, Charles Taylor contributed nothing under the agreement except a large indebtedness—an insolvent business. Although this factor is tied to the fraud committed by Taylor, it has a bearing on failure to perform in accordance with the oral contract. Immediately upon the payment of funds by Donald Wolf to the business, the greater portion of these funds were dissipated by applying them to the indebtedness at the bank. Not until May 8, 1969, did Taylor personally assume indebtedness of the business at the bank in the sum of $25,000, after F. C. Brungardt's removal as president of the bank. Ed Brungardt would not agree to this until the $25,000 indebtedness assumed by Taylor was secured by the guarantee of Taylor's mother-in-law. For one whole year the insolvent business was saddled with the burden of this debt.

Accordingly, the trial court did not err in its refusal to submit the issue of the statute of limitations as to the breach of the oral contract to the jury. On the evidence presented the action was filed by he Wolfs within three years of the breach of the contract.

Under K. S. A. 1973 Supp. 60-513 an action for relief on the ground of fraud must be brought within two years, but the cause of action shall not be deemed to have accrued until the fraud is

discovered. The statute of limitations with respect to an action for fraud under 60-513, *supra,* is practically identical to the previous section in the old code of civil procedure (See, G. S. 1949, 60-306, *Third*) pertaining to such action. Cases involving the statute of limitations on the ground of fraud under the old code of civil procedure have not been diluted by the new code. Our prior decisions on this point are authoritative under 60-513, *supra.*

There is no dispute that the first actual discovery of the fraud in this case was in September 1969, which is within the limitation period for an action commenced July 6, 1971. The appellants' entire argument is directed to whether or not the Wolfs could have discovered the fraud before July 6, 1969, by the exercise of reasonable diligence. The appellants rely upon the general rule as to the statute of limitations in cases of fraud. This rule is that in order to prevent the running of the statute of limitations in proceedings for relief on account of fraud, it must appear not only that the complainant was in ignorance of the fraud, but also that he did not have possession of the means of detecting the fraudulent arrangement. To prevent the barring of an action, it must appear that the fraud not only was not discovered but could not have been discovered with reasonable diligence, until a time falling within the statutory period before the action was begun. (*Davis v. Heynes,* 105 Kan. 75, 181 Pac. 566; and *Malone v. Young,* 148 Kan. 250, 81 P. 2d 23.)

The query on appeal is whether the law imposes upon the Wolfs the burden to discover the fraud under the circumstancse of this case.

The appellees contend because of the unequal knowledge of the parties, the appellees were justified in continuing to rely upon the representations of the appellants. They argue, the law does not deprive a defrauded party of relief because he had opportunity to investigate, when his lack of knowledge was such that the investigation would disclose nothing to him. This proposition finds support in the Kansas law.

It has been held under the old code of civil procedure that the phrase "discovery of the fraud", which would start the statute of limitations to running, means the discovery by the person defrauded of such facts indicating he had been defrauded as would cause a reasonably prudent person to investigate, and which, if investigated with reasonable diligence, would lead to knowledge

of the fraud. (*Gates v. Kansas Farmers' Union Royalty Co.*, 153 Kan. 459, 111 P. 2d 1098; and *Woodworth v. Kendall,* 172 Kan. 332, 239 P. 2d 924.)

Many years ago this court said the modern tendency is to restrict rather than extend the immunity of one who gains an advantage over another by purposely misleading him. (*Harvester Co. v. Hardware Co.,* 101 Kan. 488, 167 Pac. 1057.)

In *Speed v. Hollingsworth,* 54 Kan. 436, 440, 38 Pac. 496, the court said:

"The trend of the decisions of the courts of this and other states is towards the just doctrine, that where a contract is induced by false representations as to material existent facts, which are made with the intent to deceive, and upon which the plaintiff relied, it is no defense to an action for rescission or for damages arising out of the deceit, that the party to whom the representations were made might, with due diligence, have discovered their falsity, and that he made no searching inquiry into facts. . . ."

Where one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud, especially when the other party relies upon him to communicate to him the true state of facts to enable him to judge of the expedience of the bargain. (*Reeder v. Guaranteed Foods, Inc.,* 194 Kan. 386, 399 P. 2d 822; and *Jenkins v. McCormick,* 184 Kan. 842, 339 P. 2d 8.)

Many decisions of this court hold the law does not deprive a defrauded party of relief because he had opportunity to investigate when his lack of knowledge was such that the investigation would disclose nothing to him. (*Elerick v. Reid,* 54 Kan. 579, 38 Pac. 814; *Murrow v. Bonebrake,* 84 Kan. 724, 115 Pac. 585; *Foote v. Wilson,* 104 Kan. 191, 178 Pac. 430; *Fourth Nat'l Bank v. Webb,* 131 Kan. 167, 290 Pac. 1; *Sluss v. Brown-Crummer Inv. Co.,* 143 Kan. 14, 53 P. 2d 900; *Morton v. Brinks,* 108 Kan. 743, 747, 197 Pac. 210; and *Williams v. Hanna,* 105 Kan. 540, 185 Pac. 17.)

In *Murrow v. Bonebrake,* supra, the plaintiff purchased a diamond from a knowledgable jeweler who misrepresented the diamond's quality and value. The plaintiff had an opportunity to examine the diamond personally. Nevertheless, the court allowed recovery because of the disparity in knowledge. The case stands for the proposition that where lack of knowledge on the plaintiff's

part renders investigation futile, he is entitled to rely on the representations and disclosures of the defendant who has superior knowledge of the facts.

In the case at bar an investigation by Donald Wolf would have been to no more avail than that of the diamond purchaser in *Morrow v. Bonebrake*, supra. Donald was only nineteen years of age and almost totally devoid of business experience. He had taken no business courses in high school and had no knowledge of bookkeeping or business records. In addition, the records of the business finances kept by Charles Taylor were sketchy at best. The appellant's brief is replete with references to bits of testimony in the record that indicate Donald Wolf could have discovered the truth. This is essential to the appellants' assertion that the appellees' claim was barred by the statute of limitations. There is, however, no evidence that Donald Wolf could have done so on his own in any manner other than requesting the information directly from the very persons who defrauded him. When he finally did discover the fraud, it was after Charles Taylor had abandoned the business and F. C. Brungardt was no longer president of the bank. It was the initiative of Donald Wolf which led to the disclosure.

Donald Wolf could have examined the books everyday without discovering the fraud because of his lack of knowledge. The appellants, Charles Taylor and F. C. Brungardt, never proffered any financial statement for investigation, nor did they ever seek to share the knowledge they had or to educate young Wolf in the financial affairs of the business. On the contrary, they represented that the business was in good shape. Having induced the transaction they can not now be heard to complain because the appellees did not discover the fraud sooner.

Where, under all of the circumstances of the case, there is nothing to put the appellees on inquiry they may continue to rely on the representations made by the appellants. The appellees did not have a duty to investigate further. There would seem to be little doubt that while, in the ordinary business transactions of life, men are expected to exercise reasonable prudence and not rely upon others with whom they deal to care for and protect their interests, this requirement is not to be carried so far that the law shall ignore or protect positive, intentional fraud successfully practiced upon the simple minded or unwary. (*Harvester Co. v. Hardware Co.*, Supra.)

In the case at bar there was nothing to cause the appellee to

suspect the business had a large burden of outstanding debt. Both Charles Taylor and F. C. Brungardt were aware of the fact and did not disclose it. On the contrary, they made positive assertions as to the good condition of the business. Under the above principle such representations could be relied upon without calling for a financial statement or making other investigation. Once the fraud has been completed the defrauded party can continue to rely upon the assertions and the statute of limitations will not commence to run until the defrauded party has some information which will put *him* on inquiry to discover the true facts.

The facts relied upon by the appellants to show that the duty of due diligence required the appellees to discover the fraud at an earlier date are that Donald Wolf had access to the books of the business, that he was aware Charles Taylor had written a check to the bank for $8,000, and that the business had no money. These facts may disclose that the business was not going well and was failing with partnership funds. They do not, however, go to the issue of the specific fraud alleged—misrepresentation regarding the large burden of outstanding indebtedness to the Farmers National Bank, which doomed the business from the start. Charles Taylor's efforts to conceal the fraud consisted of complaints that F. C. Brungardt had not contributed his share of the capital, without which the purchase of necessary inventory for the business was stymied.

A careful analysis of the record indicates Charles Taylor stood in the relationship of a fiduciary to Donald Wolf. Under these circumstances the duty of due diligence to discover the true facts is reduced. In *Paul v. Smith,* 191 Kan. 163, 380 P. 2d 421, the court said:

"Fiduciary relationships recognized and enforceable in equity do not depend upon nomenclature; nor are they necessarily the product of any particular legal relationship. (*Grannell v. Wakefield,* 172 Kan. 685, 242 P. 2d 1075; and *Lindholm v. Nelson,* supra.) They may arise out of conduct of the parties evidencing an agreement to engage in a joint enterprise for the mutual benefit of the parties. (*Grannell v. Wakefield,* supra; and *Yeager v. Graham,* 150 Kan. 411, 94 P. 2d 317.) But they necessarily spring from an attitude of trust and confidence and are based upon some form of agreement, either expressed or implied, from which it can be said the minds have met in a manner to create mutual obligations. (*Shoemake v. Davis,* 146 Kan. 909, 73 P. 2d 1043; Pomeroy's Equity Jurisprudence, Vol. 3, § 902; and *Appleman v. Kansas-Nebraska Natural Gas Company* [U. S. C. A. 10th Cir. 1954] 217 F. 2d 843.)

"For the plainest of reasons, agreements establishing fiduciary relationships, if not in writing, must be clear and convincing. Because of the acuteness of

the equitable remedies, courts will not reach out to establish legal relationships from which enforceable equitable rights may flow. A confidential relationship is never presumed, and the burden of proof is upon the party asserting it. (*Yeager v. Graham,* supra; *Grannell v. Wakefield,* supra; and *Appleman v. Kansas-Nebraska Natural Gas Company,* supra.)

"Mere concert of action, without more, does not establish a fiduciary relationship. (*Grannell v. Wakefield,* supra; and *Yeager v. Graham,* supra.) Undoubtedly, parties may deal at arm's length for their mutual profit. It is only when, by their concerted action, they willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiduciary relationship arises. (*Appleman v. Kansas-Nebraska Natural Gas Company,* supra.)" (p. 170.)

Anna Wolf knew nothing of the Hays Electronic Supply business whatever, and she had no business education or experience. She merely supplied the money for Donald Wolf to get into the business, and in doing so was present at various stages of the negotiations when statements were made to induce her participation in the scheme of the appellants. Accordingly, the same rules that apply to Donald Wolf apply to her, except those pertaining to a fiduciary relationship. The appellants do not contend that Anna Wolf had any information that might have put her on notice of the fraud.

For the reasons heretofore stated we cannot say the trial court erred in refusing to submit a fact issue to the jury on whether the action for fraud was barred by the statute of limitations. While the trial judge assigned the wrong reason at the trial of this matter for its ruling, on the whole record, we hold as a matter of law the trial court properly withdrew this issue from the jury and the action was filed within the two year period required for actions brought on the ground of fraud.

What has heretofore been said is adequate to show the evidence was sufficient to warrant the submission of the case to the jury on the grounds of fraud and breach of contract.

Other questions raised by the appellants have been carefully considered but are found to have insufficient merit to warrant a reversal. A discussion of these questions would add nothing to the body of our Kansas law.

From the whole record we conclude the judgment entered by the trial court upon the verdict resulted in substantial justice between the parties. (K. S. A. 60-261.)

The judgment of the lower court is affirmed.