**SAXON MORTGAGE, INC., Plaintiff,**

v.

**MORTGAGE PLUS, INC., Defendant.**

**No. 99–2472–JWL.**

United States District Court, D. Kansas.

Jan. 31, 2001.

Joseph M. Rebein, Timothy M. Huskey, Paula Hicks, Schaefer, Shook, Hardy & Bacon L.L.P., Kansas City, MO, for Plaintiff.

James S. Kreamer, John P. Patterson, Baker, Sterchi, Cowden & Rice, L.L.C., Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This contract claim arises out of a series of business transactions between Saxon Mortgage, Inc. ("Saxon") and Mortgage Plus, Inc. ("Mortgage Plus"). Saxon alleges that Mortgage Plus breached the terms of a contract set out in a letter written by Mark Welch of Mortgage Plus to Ronald Waldron of Saxon on June 23, 1999. Saxon claims that the letter constituted an offer by Mortgage Plus to refinance or repurchase four loans from Saxon if Saxon purchased two of those loans from Mortgage Plus. Saxon alleges that it accepted the offer and purchased the two loans from Mortgage Plus, thereby relieving Mortgage Plus of pressure to remove the loans from its line of credit. Mortgage Plus did not subsequently refinance or repurchase the four loans and Saxon brought this claim.

Mortgage Plus defends Saxon's claim by arguing that the June 23 agreement is unenforceable because Saxon had a preexisting duty to purchase the two loans and because Saxon failed to disclose to Mortgage Plus that the four loans were based on erroneous appraisals and forged papers and that two of the loans were in early default. Mortgage Plus counterclaims alleging that Saxon breached a duty to purchase three other loans from Mortgage Plus as required by a Sales Agreement entered into between Saxon and Mortgage Plus on September 3, 1998.

A trial to the court was held from January 3, 2001, to January 5, 2001. The court has considered the evidence and arguments presented at trial and is now prepared to issue its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons set out below, the court concludes that Mortgage Plus did not breach a contract embodied in the June 23 letter because the contract is unenforceable. The court further concludes that because Mortgage Plus was not obligated to repurchase the four loans pursuant to the June 23 agreement, Saxon was not relieved of its obligation to purchase the three loans that are the subject of Mortgage Plus' counterclaim.

● Findings of Fact

Saxon is a Virginia corporation with its principal place of business in Virginia and Mortgage Plus is a Kansas corporation with its principal place of business in Johnson County, Kansas. Mortgage Plus is in the business of originating mortgage loans. Mortgage Plus finds home buyers in need of a mortgage, prepares loan applications and submits them to end-lenders like Saxon, closes the loans and advances its own funds to the buyer after receiving notice that an end-lender has approved the loan application and, finally, sells the mortgage loan to the end-lender. Saxon is an end-lender in the mortgage business. End-lenders purchase mortgage loans originated by approved lenders and fund loans originated by approved brokers.

Saxon follows a policy of only purchasing mortgage loans from approved lenders. Mortgage Plus was approved by Saxon as a lender and, on September 3, 1998, Saxon and Mortgage Plus entered into a Sales Agreement whereby Mortgage Plus "agrees to participate in Saxon Mortgage Loan Programs and to deliver to Saxon such Mortgage Loans in the aggregate principal amounts as are agreed between Saxon and [Mortgage Plus]" and "Saxon agrees to purchase such Mortgage Loans from [Mortgage Plus] on the terms and subject to the conditions of the [Seller] Guide ... " The Sales Agreement incorporates by reference the Seller Guide's definition of Mortgage Loans: "A mortgage loan sold or intended to be sold to Saxon that meets or is intended to meet all the requirements of this Seller/Servicer

Guide." Saxon prepared both the Sales Agreement and Seller Guide and Mortgage Plus did not negotiate the terms of either document.

The Seller Guide defines "Seller" as "[a]n entity that has entered into a Sales/Servicing Agreement with Saxon and that has sold Mortgage Loans to Saxon." As an approved lender, Mortgage Plus was a seller of mortgage loans to Saxon. Pursuant to the Seller Guide, a seller must submit to Saxon loan applications with the supporting documents listed in the Seller Guide. Saxon then reviews the applications and supporting documents pursuant to its underwriting procedures and, if the loan is approved, Saxon issues a Loan Underwriting Approval Commitment (a "commitment"). The commitment may be issued with conditions that must be satisfied prior to the loan closing. If the conditions are satisfied, Saxon is obligated to purchase the loan subject to the terms of the Seller Guide.

The Seller Guide requires that a seller maintain a quality control program to ensure that each mortgage loan sold to Saxon is of investment quality, as defined by the Seller Guide. Under the terms of the Seller Guide, a seller warrants to Saxon that any mortgage loan sold to Saxon is of investment quality and, if Saxon determines it is not of investment quality, the seller may be required to repurchase the loan. Should a seller fail to repurchase such a loan, the Seller Guide provides Saxon with the right to suspend or terminate the selling privileges of the seller.

Kelly Financial Services, Inc. ("Kelly Financial") is a mortgage loan broker located in Wichita, Kansas. Kelly Financial originated and processed mortgage loans but, unlike Mortgage Plus, did not evaluate applications or loan its own money when closing loans. Instead, Kelly Financial waited for funding from a lender like Sax-

on. Kelly Financial submitted applications to multiple lenders in an effort to find the best rate for borrowers.

Ronald Waldron was the Saxon area sales manager covering Kansas City when Mortgage Plus became an approved lender. David Chase was the Saxon sales representative assigned to Mortgage Plus. Mr. Chase received a significant part of his compensation in the form of commissions. The territory that Mr. Chase covered included both Mortgage Plus and Kelly Financial. Mr. Chase contacted Kelly Financial and solicited its application to become an approved broker with Saxon. According to Latonia Kelly, Mr. Chase was familiar with Kelly Financial because Kelly Financial did business with his previous employer, another lender in the mortgage business.

Kelly Financial applied to Saxon for approval and began submitting loan applications to Saxon. Kelly Financial received a loan commitment from Saxon for the Chapman loan but was not yet approved to do business with Saxon when the closing date for the loan was only a few days away. Latonia Kelly called Mr. Chase and asked him what to do. Mr. Chase gave Ms. Kelly the name of First Western, a Saxon-approved broker in Kansas, and suggested that Kelly Financial use First Western to close the loan.[1] Kelly Financial asked First Western for assistance and First Western agreed to close the loan, but took longer than Kelly Financial expected and the closing was delayed.

Kelly Financial submitted paperwork for a second loan, the Johnson loan, and Saxon issued a commitment for the loan. Kelly Financial was still not approved by Saxon when the closing date for the Johnson loan was a few days away. Kelly Financial waited until the closing date was near before seeking help to close the loan be-

---

1. Both Latonia Kelly and David Chase testified at trial. David Chase testified that he gave Ms. Kelly the name of both First Western and Mortgage Plus, the two Saxon approved businesses in Kansas, because he wanted to remain neutral. Ms. Kelly testified that Mr. Chase gave her only the name of First Western to close the Chapman loan and then, for later loans, directed her to use Mortgage Plus.

cause Kelly Financial expected to be approved to do business with Saxon at any time. Kelly Financial did not want to use another broker or lender to close the loans because Kelly Financial made less money when using the services of another business. Kelly Financial submitted its application to become an approved Saxon broker approximately one month before the Johnson loan was scheduled to close. Applications to become an approved Saxon broker generally are approved in less than one week. When employees of Kelly Financial inquired with Mr. Chase about the approval status, Mr. Chase said that approval would come any day. Mr. Chase did not tell anyone at Kelly Financial that there was a problem with its application.

The Johnson loan was for the purchase of a home. Home sales contracts generally specify a closing date, after which the parties to the contract have the option to rescind the contract. The Johnson loan closing date was set for March 17, 1999. Because Kelly Financial was not yet approved to do business with Saxon, Mr. Chase gave Kelly Financial the name of Mortgage Plus to assist Kelly Financial in closing the loan. Mortgage Plus, unlike First Western, loaned its own money at closing and, therefore, could close a loan in a shorter period of time. Latonia Kelly called Mark Welch at Mortgage Plus and told him that Mr. Chase had referred her to Mortgage Plus for assistance in closing the Johnson loan.

Prior to Latonia Kelly calling Mr. Welch, Mr. Chase had discussed the matter with Mr. Welch and Todd Geiman of Mortgage Plus. Todd Geiman was President of Mortgage Plus and Mark Welch was Vice–President. The testimony of Mr. Chase about these discussions differs significantly from the testimony of Mr. Geiman and Mr. Welch. To the extent that their testimony is in conflict, this court accepts the version of events told by Mr. Geiman and Mr. Welch. Mr. Chase's testimony seemed rehearsed and insincere. The version of events told by Mr. Chase was inconsistent with the testimony of Latonia Kelly, a neutral party. Mr. Chase

was a commissioned sales person who had a strong motive to close as many loans through Saxon as possible. His testimony that he remained neutral and did not push Mortgage Plus to close the loans for Kelly Financial was not believable. Furthermore, Mr. Chase could be personally liable to Saxon if he exceeded the scope of his agency and bound Saxon to purchase the four loans at issue from Mortgage Plus. Mr. Welch, on the other hand, has no motive to fabricate because he is no longer associated with Mortgage Plus and there is no evidence that he would be affected by a judgment against Mortgage Plus. Mr. Geiman's demeanor and recall of detail indicate that his testimony was truthful. Conversations between Mr. Chase and Mr. Geiman were overheard by a Mortgage Plus employee, Tonya Spencer, whose testimony was consistent with that of Mr. Geiman.

According to Mr. Chase, he told Mr. Welch that he was not familiar with Kelly Financial and that he would not vouch for the company. This claim conflicts with Latonia Kelly's testimony that Mr. Chase worked with Kelly Financial when he was with his previous employer. Mr. Chase also claimed that he did not tell Mr. Welch that Saxon would buy the Johnson loan. Mr. Chase explained that it was beyond his authority to commit Saxon to buying the Johnson loan. Mr. Chase said that Mortgage Plus was his biggest customer and that he would not jeopardize the relationship. Mr. Chase also testified that he spoke only with Mr. Welch, and not Mr. Geiman, about the Johnson loan. This claim conflicts with the testimony of Mr. Geiman and Tonya Spencer, a Mortgage Plus employee.

Mr. Geiman testified that Mr. Chase approached him and said that Saxon was trying to develop a business relationship in Wichita with a firm called Kelly Financial. Mr. Chase told Mr. Geiman that Kelly Financial had applied for approval to do business with Saxon and that it was just a matter of time before Kelly Financial was

approved. Mr. Chase said that he was under pressure and needed help because Kelly Financial had a loan approved by Saxon with a closing date approaching on a residential housing contract. Mr. Geiman explained that he knew that residential housing contracts set a firm closing date and that he understood why Mr. Chase could not just push back the closing date until Kelly Financial was approved.

Mr. Chase told Mr. Geiman that the Johnson loan was approved by Saxon and asked Mortgage Plus to provide the closing documents and fund the loan so that the closing date could be met. Mr. Geiman explained that it was an unusual request but that he had confidence in the Saxon underwriting process and knew that if Saxon had issued a commitment for the loan that Saxon would purchase the loan. Mr. Chase told Mr. Geiman that the loans are done and "ready to go" and Mr. Geiman understood this to mean that Saxon simply wanted Mortgage Plus to issue the closing papers and fund the loan. Mr. Geiman explained that he understood that Mr. Chase was not asking Mortgage Plus to review the loan application for approval or do any quality control and that it would be impossible to do so given the short amount of time before the closing date. Because Mortgage Plus did not review the loans, Mortgage Plus did not intend to make any representations to Saxon regarding the quality of the loans.

Mr. Geiman testified that he had not heard of Kelly Financial and that he relied on Mr. Chase's representation that Kelly Financial was trustworthy. Mr. Chase told Mr. Geiman that he had known Kelly Financial for a long time and did not say that there was any problem with the Kelly Financial application to Saxon. Mr. Geiman testified that he had a good relationship with Mr. Chase and Saxon. Mr. Geiman believed that the relationship with Saxon was valuable to Mortgage Plus and he agreed to help Saxon by closing and funding the Johnson loan because he valued Mortgage Plus' relationship with Saxon. Mr. Chase also told Mr. Geiman that there may be another loan with a closing date after the Johnson loan where Kelly Financial would also need help.

Mr. Welch testified that Mr. Chase also talked to him about the Johnson loan. According to Mr. Welch, Mr. Chase said that the Kelly Financial application was in the process of being approved and asked if Mortgage Plus would help him out of a crunch and issue the closing documents and fund the loan. Mr. Chase told Mr. Welch that Saxon had issued a commitment on the loan and that it was "ready to go." Mr. Welch explained that Mr. Chase used this language in the past when Saxon had approved a loan and all conditions were met, meaning that Saxon was committed to purchasing the loan.

When Mr. Welch received the phone call from Latonia Kelly, he asked her to fax Mortgage Plus a copy of the Johnson loan application and the Saxon commitment. Ms. Kelly faxed both documents to Mortgage Plus. Mr. Welch explained that he requested the loan application because Mortgage Plus needed the information on the application to complete the closing documents. Mortgage Plus issued the closing documents and funded the Johnson loan on the closing date. For their services, Mortgage Plus was paid $250. According to Mr. Welch and Mr. Geiman, the payment was to recover the costs of closing and funding the loan. Mortgage Plus did not profit from the transaction. In a typical transaction, Mortgage Plus earns $3,500.

A second loan, the Bryant loan, was approved by Saxon and Kelly Financial again needed Mortgage Plus to assist with closing the loan. According to Mr. Welch, Mr. Chase requested that Mortgage Plus give the same assistance as it did with the Johnson loan. Mortgage Plus agreed and closed and funded the Bryant loan. Kelly Financial needed help with two more loans, the Wright and Coulter loans, before finally being approved by Saxon. Both loans were approved by Saxon and, as the closing date neared, Latonia Kelly was told by Saxon's underwriting division that Kelly Financial was still not approved

and that Kelly Financial should use Mortgage Plus to close the loan. Ms. Kelly called Mr. Welch and asked for help with the loans. Mortgage Plus contacted the underwriting department of Saxon and was given the "go ahead" to help Kelly with each of the loans. Mortgage Plus closed and funded the loans.

Saxon purchased the Bryant and Wright loans from Mortgage Plus but refused to purchase the Johnson and Coulter loans. Saxon issued denial forms specifying that Saxon would not purchase the Johnson and Coulter loans because they were not arms-length transactions. The Wholesale Manual specifies that transactions that are not arms-length are generally not acceptable but does not define an arms-length transaction. In the case of the Johnson, Bryant, Wright and Coulter loans, Saxon deemed the loans not to be arms-length transactions because the seller of the homes was also an owner of Kelly Financial, the mortgage originator. The loan applications and supporting documents submitted to Saxon for each of the four loans showed that the seller of the property was a Kelly family member and that the broker was Kelly Financial. Saxon's underwriting department was in possession of and had reviewed these documents prior to issuing commitments for the loans.

Ronald Mitchell, the investigation manager in Saxon's risk control department, testified that he discovered problems with the Johnson, Bryant, Wright and Coulter loans after they had been approved by the underwriting department and the loans had closed. Mr. Mitchell testified that his department discovered that the loans were not arms-length transactions, two of the loans were in early default, the property appraisals were erroneous, and that some of the supporting documents were falsified. Each of the loans had a problem beyond not being arms-length transactions. Saxon discovered all of these problems prior to June 23, 1999.

Mortgage plus maintains a warehouse line of credit with First Federal Lincoln Bank for the purpose of funding loans that it closes. Mortgage Plus tries to keep loans on the line of credit for only seven days. If a loan remains on the line of credit for more than 30 days, the bank pressures Mortgage Plus to quickly remove the loan. The bank does not want loans to remain on the line of credit for a long period of time because the bank does not hold any collateral. In fact, the bank will only release funds to Mortgage Plus if a commitment has issued from an end-lender like Saxon. The bank has the right to terminate the line of credit if Mortgage Plus does not timely remove loans from the line of credit. Because Saxon refused to purchase the Johnson and Coulter loans, the loans remained on Mortgage Plus' line of credit for more than 30 days. The bank pressured Mortgage Plus to remove the loans quickly.

When Mr. Welch saw the denial forms for the Johnson and Coulter loans, he called Mr. Waldron, the Saxon area sales manager. Mr. Waldron assured Mr. Welch that the situation would be resolved and that he would talk to his superiors. Later, Mr. Waldron spoke to Mr. Welch and told him that Saxon would purchase the loans only if Mr. Welch wrote a letter to Saxon saying that Mortgage Plus would refinance or repurchase the Johnson, Bryant, Wright and Coulter loans. Mr. Welch faxed Mr. Waldron a letter on June 23, 1999, stating that Mr. Welch "will personally utilize the resources of Mortgage Plus to refinance the four referenced loans from Saxon's books by September 30, 1999." Officials at Saxon found the letter unacceptable and Mr. Waldron called Mr. Welch and said that the letter must specify that Mortgage Plus will refinance or repurchase the four loans. Mr. Welch faxed Saxon a second letter later that day. The letter requested that Saxon "expedite the purchase of [the Johnson and Coulter loans] at the earliest possible time" and specified that "Mortgage Plus will refinance or repurchase the four referenced loans from Saxon's books by September 30, 1999."

Mr. Waldron told Mr. Welch that the problem with the four loans was that they were not arms-length transactions. Mr. Waldron did not mention any other problems with the loans. Saxon did not provide Mortgage Plus with its files on the four loans. The files contained reports from Saxon's risk control department showing all of the problems with the loans, including erroneous appraisals, forged papers, and early defaults. Mr. Geiman and Mr. Welch testified that they thought that it would be simple to refinance the four loans because they believed that the only problem with the loans was that they were not arms-length transactions. According to Mr. Geiman, the problem could be corrected by refinancing the loans through Mortgage Plus instead of Kelly Financial. Mr. Geiman said that he expected to lose a little money because he thought that he may need to offer slightly lower rates to induce the borrowers to agree to refinance. Had he known that there were other problems with the loans, such as erroneous appraisals, Mr. Geiman testified that Mortgage Plus would never have agreed to refinance or repurchase the loans. According to Mr. Welch and Mr. Geiman, it would be impossible to refinance loans with erroneous appraisals and if Mortgage Plus repurchased the loans, Mortgage Plus would incur a huge loss.

After receiving the letter from Mr. Welch, Saxon purchased the Johnson and Coulter loans from Mortgage Plus. Mortgage Plus attempted to refinance the loans but quickly discovered that the appraisals were erroneous. Mr. Geiman testified that the appraisals were substantially higher than the market value of the properties. For example, Mr. Geiman said that the appraisal on the Bryant loan was about $50,000 and the tax appraisal for the property was only $18,000. In addition, when trying to refinance the loans, Mr. Geiman was unable to contact any of the borrowers or Kelly Financial. Mr. Geiman realized that it would be impossible for Mortgage Plus to refinance the loans.

On October 1, 1999, representatives of Saxon met with Mr. Welch and Mr. Gei-man. Saxon demanded that Mortgage Plus repurchase the four loans and Mortgage Plus said that repurchasing the loans would be impossible. Mortgage Plus asked for more time to attempt to refinance the loans. Saxon denied the request and suspended Mortgage Plus from selling loans to Saxon. The parties have stipulated that if Mortgage Plus was obligated to repurchase the four loans, Saxon was damaged in the amount of $145,989.19 by the breach of that duty.

Mortgage Plus continued to sell loans to Saxon through September 30, 1999. Saxon issued commitments on three loans, the Keough, Cook and Ammon loans, prior to September 30, 1999, and all of the conditions for the commitments were met prior to September 30, 1999. After Saxon suspended Mortgage Plus it declined to purchase the three loans. The Seller Guide provides Saxon with the right to suspend a seller in the event of "seller default." If Saxon suspends a seller, the Seller Guide allows Saxon to refuse to purchase loans from a suspended seller even if commitments have been issued. "Seller default" is defined by the Seller Guide to include when a seller "has failed to repurchase from Saxon any Mortgage Loan required by Saxon to be repurchased under the terms of this Seller Guide." Pursuant to the Seller Guide, Saxon may require a seller to repurchase a loan upon "the breach of any requirement, representation or warranty included in this Seller Guide or in the event of a Seller Default." Mortgage Plus was forced to find other buyers for the three loans and incurred additional costs in doing so. The parties have stipulated that if Saxon was obligated to purchase the three loans, Mortgage Plus was damaged in the amount of $25,000 by the breach of that duty.

● Conclusions of law

■ The first issue in this case is whether the Sales Agreement, and, therefore, the terms of the Seller Guide and Wholesale Manual, applies to the sale of the Johnson, Bryant, Wright and Coulter

loans to Saxon. If it applies, then Mortgage Plus, by selling the four loans to Saxon, represented to Saxon that the loans were "investment quality" and Saxon is afforded the remedies specified in the Seller Guide upon determining that the loans were not "investment quality." If it does not apply, Saxon cannot rely on the protection afforded to it under the Seller Guide.

The Sales Agreement applies to the sale of "Mortgage loans" as the term is defined in the Seller Guide. The Seller Guide defines a "Mortgage Loan" as "[a] mortgage loan sold or intended to be sold to Saxon that meets or is intended to meet all the requirement of this Seller/Servicer Guide." It is likely that when Saxon drafted the Sales Agreement and Seller Guide, it intended that the definition of "Mortgage Loan" be broad and encompass all mortgage loans sold to Saxon. The purpose of Saxon's policy of purchasing loans only from sellers who have signed a sales agreement and are bound by the terms of the Seller Guide is likely to ensure that Saxon is protected by the terms of the Seller Guide.

██ While this court can speculate about the intent of Saxon when drafting the definition of "Mortgage Loan," the court is bound to follow the plain meaning of the definition. The parties have stipulated that Kansas law controls in this case. Under Kansas law, "[w]here a provision in a contract is clear and unambiguous, it must be given its plain meaning and enforced accordingly." *First Hays Banshares, Inc. v. Kansas Bankers Surety Co.,* 244 Kan. 576, 769 P.2d 1184 (1989). The language of the definition is clear and unambiguous. Under the definition, a mortgage loan sold to Saxon that does not meet nor is intended to meet all of the requirements of the Seller Guide is not covered by the Sales Agreement. Saxon drafted the language. If Saxon intended that the definition be broad enough to encompass all

mortgage loans sold to Saxon, it did not so define the term. The court's holding would be the same even if the definition were subject to two different, yet reasonable interpretations because Kansas follows the "common-law rule of interpretation that in such situations, a court should construe the terms of a writing against the drafter." *Dillard Dep't Stores, Inc. v. Kansas Dep't of Human Resources,* 13 P.3d 358, 364 (2000).[2] Moreover, the facts and circumstances surrounding the contract's making persuades the court that the parties never intended to cover such an unconventional arrangement as this. *See Wolfgang v. Mid–America Motorsports, Inc.,* 111 F.3d 1515 (10th Cir.1997) (applying Kansas law and explaining that the court will consider evidence of facts and circumstances surrounding a contract's execution when the document is ambiguous on its face).

Mr. Welch and Mr. Geiman believed that Mr. Chase, on behalf of Saxon, requested that Mortgage Plus issue the closing documents and fund the Johnson, Bryant, Wright and Coulter loans without evaluating the loan applications to determine whether they met all of the requirements of the Seller Guide. Mortgage Plus could not have evaluated and approved the loans by the closing dates. Mr. Chase was in the Mortgage Plus office daily and was familiar with Mortgage Plus procedure for approving a loan. It was reasonable, therefore, for Mr. Geiman and Mr. Welch to believe that Mr. Chase realized that Mortgage Plus could not evaluate the loans prior to closing. Pursuant to the request by Mr. Chase, Mortgage Plus simply did the mechanical work of issuing the closing documents and then funding the loans as an accommodation to Saxon.

The Johnson, Bryant, Wright and Coulter loans did not, in fact, meet all of the requirements of the Seller Guide. Be-

---

**2.** The rule would be applicable because the parties were not of equal bargaining power and Mortgage Plus did not have the opportunity to bargain for or negotiate the terms of

the contract or Seller Guide. *See Weber v. Tillman,* 259 Kan. 457, 476, 913 P.2d 84 (1996).

cause Mortgage Plus was not able to evaluate the loans to determine if they met all of the requirements of the Seller Guide within the time frame in which Saxon desired that Mortgage Plus act, and especially since Saxon must have known that this was the case, the court concludes that Mortgage Plus did not intend that the loans meet all of the requirements.[3] The four loans, therefore, were not "Mortgage Loans" covered by the Sales Agreement between Mortgage Plus and Saxon. In addition, the request by Mr. Chase that Mortgage Plus close and fund the loans in such a short period of time constituted a request that Mortgage Plus sell the loans to Saxon in a transaction not covered by the procedures and terms of the Sales Agreement and Seller Guide. It would be unreasonable to construe the request to mean that Mortgage Plus was not allowed time to follow the quality control procedures of the Seller Guide but was required to warrant to Saxon that the loans meet all of the requirements set out in the Seller Guide. Because the Sales Agreement and Seller Guide did not apply to the sale of the loans to Saxon, the court will not consider the provisions of the Seller Guide that a seller represents to Saxon that loans are "investment quality" and that Saxon may require repurchase if it determines that loans are not "investment quality."

Mortgage Plus argues that the June 23 letter is not enforceable as a contract because Saxon misrepresented the quality of the four loans. If Mortgage Plus agreed to the terms of the June 23 letter because Saxon made a material mis-

representation, the contract is voidable. According to the Restatement of Contracts, an authority often relied on by Kansas courts, "[i]f a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Restatement (Second) of Contracts § 164(a) (1981). Mr. Welch agreed to the terms set out by Mr. Waldron and faxed a letter to Mr. Waldron setting out those terms. In doing so, Mortgage Plus manifested its assent to the terms of the agreement in the letter.[4] That assent was based on a material misrepresentation by Saxon that the only problem with the loans was that the transactions were not arms-length.

Saxon's failure to disclose the additional problems with the loans constituted an assertion that the problems did not exist. According to the Restatement, "[a] person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist ... where he knows that disclosure of the fact would correct a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." Restatement (Second) of Contracts § 161(b) (1981). When Mr. Welch wrote the June 23 letter and agreed to its terms, he believed that the only reason that Saxon had refused to purchase the Johnson and Coulter loans and wanted Mortgage Plus to refinance or

---

**3.** Under the definition of "Mortgage Loan" incorporated into the Sales Agreement, the court must focus on whether Mortgage Plus, and not another party, intended that the four loans meet the requirements of the Seller Guide. It is not relevant whether Kelly Financial intended the loans to meet the requirements of the Seller Guide. It would be unreasonable to interpret the definition to include loans intended to meet the requirements of the Seller Guide by anyone, not just Mortgage Plus. Under such an interpretation, Saxon could simply say that it intends that every loan meets the requirements of the Seller Guide, thereby making every loan sold to

Saxon a "Mortgage Loan" and making meaningless the portion of the definition "or intended to meet the requirements of the Seller Guide." Even if this court found such an interpretation to be reasonable, then there are two different, yet reasonable interpretations of the definition and this court must construe the definition against the drafter. *Dillard Dep't Stores, Inc. v. Kansas Dep't of Human Resources*, 13 P.3d 358, 364 (2000).

**4.** A contract, of course, requires a mutual manifestation of assent. *See Steele v. Harrison*, 220 Kan. 422, 428, 552 P.2d 957 (1976).

repurchase the Bryant and Wright loans was that they were not arms-length transactions. By June 23, Saxon knew that each of the four loans had additional problems, including erroneous appraisals, forged papers, and early defaults. Saxon failed to tell Mortgage Plus about these additional problems. The loan denial forms issued for the Johnson and Coulter loans listed as the basis for denial only that the loans were not arms-length transactions and Mr. Waldron told Mr. Welch that the reason Saxon refused to purchase the loans was that they were not arms-length transactions.

A basic assumption made by Mortgage Plus in agreeing to the terms of the June 23 letter was that this was the only problem with the four loans. Mortgage Plus agreed to the terms of the June 23 letter because it would be easy and not very costly to refinance the four loans so that they were arms-length transactions. Mr. Waldron knew that there were problems with the four loans beyond not being arms-length transactions but told Mr. Welch only that Saxon would not purchase the Johnson and Coulter loans and wanted Mortgage Plus to refinance or repurchase the Bryant and Wright loans because the transactions were not arms-length. Mr. Waldron, therefore, knew that Mortgage Plus agreed to the terms of the June 23 letter based on the assumption that the only problem with the four loans was that they were not arms-length transactions. Mr. Waldron also knew that this assumption was incorrect. In failing to disclose the other problems with the loans and correct the basic assumption on which Mortgage Plus relied, Mr. Waldron failed to act in good faith and in accordance with reasonable standards of fair dealing.

Saxon's assertion that the problem with the loans was that the transactions were not arms-length necessarily implies that there were no other problems with the loans. Such assertions were half-truths and constituted misrepresentations. "A statement may be true with respect to the facts stated, but may fail to include qualifying matter necessary to prevent the implication of an assertion that is false with respect to other facts.... Such a half-truth may be as misleading as an assertion that is wholly false." Restatement (Second) Contracts § 159, cmt. b. (1981). Whether viewed through Restatement section 161(b) as a non-disclosure or section 159 as a half-truth, Saxon was obligated to disclose to Mortgage Plus that there were additional problems with the four loans.

The representation that the only problem with the loans was that they were not arms-length transactions was a material misrepresentation. "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." Restatement (Second) of Contracts § 162(2) (1981). A reasonable person in the situation of Mortgage Plus would agree to the terms of the June 23 contract if the only problem with the four loans was that they were not arms-length transactions. A reasonable person not otherwise obligated to do so would not agree to the terms of the June 23 letter knowing all of the problems with the four loans. Mr. Waldron likely knew that Mortgage Plus would agree to those terms if the only problem was that the loans were not arms-length transactions but not if Mortgage Plus knew that the loans had additional problems. Because Mortgage Plus agreed to the terms of the June 23 letter because Saxon made a misrepresentation that the only problem with the loans was that they were not arms-length transactions and because that misrepresentation was material, the contract is voidable.

The parties do not cite and this court does not find any Kansas case law discussing the principles espoused in the Restatement sections 159, 161, 162 and 164. Despite a lack of case law, this court believes that Kansas would follow the Restatement if faced with the issues in this case. The principle that a contract can be avoided if assent is induced by misrepresentation is well established. *See Corbin on Contracts*

§ 1.6 (Revised ed.1993); *Williston on Contracts* § 1:20 (4th ed.1990). Under Kansas law, fraud by silence is actionable. *See Wolf v. Brungardt,* 215 Kan. 272, 282, 524 P.2d 726 (1974) ("Where one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud ...").[5] If Kansas allows a party to a contract to bring a fraud by silence claim for damages, including punitive damages, Kansas would certainly also allow the less onerous remedy of allowing the party to avoid the contract.

■ Mortgage Plus also argues that the contract embodied in the June 23 letter is unenforceable because it lacked consideration as a result of the pre-existing duty rule. According to Mortgage Plus, it entered into an oral agreement with Saxon through Mr. Chase and Saxon's underwriting department that if Mortgage Plus closed and funded the Johnson, Bryant, Wright and Coulter loans, Saxon would purchase the loans. Thus, Mortgage Plus argues, it received nothing in return when Saxon subsequently agreed to purchase the four loans upon Mortgage Plus agreeing to repurchase or refinance them. Saxon argues in response that Mr. Chase did not did not make such an agreement and did not have the authority to do so. This court finds that Mr. Chase told Mr. Welch and Mr. Geiman that Saxon had approved the Johnson loan and that if Mortgage Plus closed and funded the loan, Saxon would purchase it. Mr. Chase knew that the loan needed to be closed and funded quickly, before Mortgage Plus could re-view and approve the loan. Mortgage Plus would not have closed and funded the loan for a marginal fee unless it believed that Saxon would purchase the loan and that Mortgage Plus was not taking any risk. The court believes that Mr. Chase understood that this was the case and told Mortgage Plus that it was "a done deal" and that Saxon would buy the loan in order to get Mortgage Plus to close the loans by the closing date.

Mr. Chase told Mr. Geiman that there may be another loan that Kelly Financial will need help closing before being approved. Mr. Geiman reasonably believed that Mr. Chase was requesting that Mortgage Plus help Kelly Financial by simply doing the same mechanical closing and funding of subsequent loans until Kelly Financial was approved by Saxon. This belief was confirmed when Mr. Chase called Mr. Welch and requested that Mortgage Plus give Kelly Financial the same help with the Bryant loan. When Ms. Kelly called Mr. Welch and asked for help with the Wright and Coulter loans, Mr. Welch reasonably believed that the agreement applied to these loans as well. Mortgage Plus even confirmed the request for help with the Saxon underwriting department.

■ The argument that Mr. Chase did not have authority to make such an agreement is not persuasive. As the Saxon sales representative to Mortgage Plus, Mr. Chase was Saxon's agent. Under Kansas law, an agent may bind a principal to a contract if the agent has either actual or apparent authority.

■ The law recognizes two distinct types of agencies, one actual and the other ostensible or apparent. The authority of

---

5. Under *Wolf,* Saxon had an obligation to disclose the problems with the loans. Saxon's quality control division discovered all of the problems with the loans and issued reports on the loans that were included in the loan files. Mortgage Plus had in its possession only the loan application forms and commitments that were faxed from Kelly Financial. Mortgage Plus did not have the supporting documents that enabled Saxon to determine that the appraisals were erroneous or that several documents were falsified. Mortgage Plus did not receive loan payments and could not be expected to know that two loans were in early default.

an actual agent may be either express or implied. It is an express agency if the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act. It is an implied agency if it appears from the statements and conduct of the parties and other relevant circumstances that the intention was to clothe the agent with such an appearance of authority that when the agency was exercised it would normally and naturally lead others to rely on the person's acts as being authorized by the principal. An ostensible or apparent agency may exist if a principal has intentionally or by want of ordinary care induced and permitted third persons to believe a person is his or her agent even though no authority, either express or implied, has been actually conferred upon the agent.

*Shawnee State Bank v. North Olathe Industrial Park, Inc.*, 228 Kan. 231, 236, 613 P.2d 1342 (1980). Saxon does not dispute that Mr. Chase was its actual agent in the ordinary course of business but argues that Mr. Chase exceeded his authority if he entered into a contract with Mortgage Plus that would not be covered by the terms of the Sales Agreement and Seller Guide.

Mr. Chase had significant involvement in the preparation of loans for approval and was the person Mortgage Plus approached with any problems. Mr. Chase appeared to Mortgage Plus to have either the authority or the ability to get approval from others at Saxon to resolve any problems with the sale of loans to Saxon. If, in fact, Mr. Chase did not have authority to enter into such agreements on behalf of Saxon, that limitation on Mr. Chase's authority was not apparent to Mortgage Plus. The testimony of Mr. Welch and Mr. Geiman convinces the court that it was reasonable for Mortgage Plus to believe that Mr. Chase had such authority. It is unreasonable to expect Mortgage Plus to know if Mr. Chase needed to seek approval from others at Saxon and to ensure that he had, in fact, been given that approval. Mortgage Plus reasonably relied on Mr. Chase's representations that Saxon would

buy the loans if Mortgage Plus closed and funded them. Mr. Chase was at least an apparent agent of Saxon, if not an actual agent, in agreeing that Saxon would buy the loans if Mortgage Plus would close and fund them and Mr. Chase bound Saxon to the agreement.

Because Mr. Chase, on behalf of Saxon, entered into an agreement with Mortgage Plus whereby Saxon was obligated to buy all four loans from Mortgage Plus, the agreement embodied in the June 23 letter lacked consideration. "It is an elementary principle of law that to be enforceable a contract must be based upon valuable consideration." *Apperson v. Security State Bank,* 215 Kan. 724, 734, 528 P.2d 1211 (1974). "It is also the rule in this jurisdiction that an agreement to do or the doing of that which a person is already bound to do does not constitute a sufficient consideration for a new promise." *Id; see also* Restatement (Second) of Contracts § 73 (1981). In return for Mortgage Plus agreeing to repurchase or refinance the four loans, the June 23 letter provides that Saxon agreed to purchase the Johnson and Coulter loans from Mortgage Plus. Pursuant to the oral agreement entered into by Mr. Chase, on behalf of Saxon, and Mortgage Plus, Saxon was already obligated to purchase the Johnson and Coulter loans. The contract embodied in the June 23 letter, therefore, is without consideration and unenforceable because of Saxon's pre-existing duty to do exactly what it promised to do in the June agreement.

The basis for Saxon refusing to purchase the Keough, Cook and Ammon loans, according to Saxon, was its right to suspend Mortgage Plus for failure to repurchase the Johnson, Bryant, Wright and Coulter loans. Under the terms of the Seller Guide, Saxon may require a seller to repurchase a loan upon "the breach of any requirement, representation or warranty included in this Seller Guide or in the event of a Seller Default" and Saxon may suspend the selling privileges of a seller who refuses to repurchase a loan from

Saxon. The Johnson, Bryant, Wright and Coulter loan sales were not covered by the Seller Guide. Mortgage Plus, therefore, did not breach any requirement, representation or warranty included in the Seller Guide and Saxon could not require Mortgage Plus to repurchase the loans. Consequently, Saxon did not have the right to suspend Mortgage Plus and Saxon was not relieved of its obligation under the Sales Agreement to purchase the three loans. Saxon, therefore, is liable to Mortgage Plus for the costs incurred in finding other buyers for the three loans.

**IT IS THEREFORE ORDERED BY THE COURT THAT** judgment be entered in favor of the defendant Mortgage Plus on Saxon's breach of contract claim.

**IT IS FURTHER ORDERED THAT** judgment be entered in favor of the defendant Mortgage Plus against plaintiff Saxon for the breach of contract counterclaim in the amount of $25,000.